FIRST FEDERAL SAVINGS & LOAN ASSOCIATION OF TOLEDO, APPELLANT AND APPELLEE, *v.* PERRY'S LANDING, INC. ET AL., APPELLEES AND APPELLANTS.

(Nos. WD-83-4 and -83-11—Decided June 3, 1983.)

*Mr. Fred E. Henning,* for appellant First Federal S. & L. Assn.

*Mr. William H. Heywood III* and *Mr. John S. Inglis,* for appellee Perry's Landing, Inc.

*Mr. Thomas Balyeat,* for appellee Perry's Landing, a Michigan partnership.

*Mr. Thomas Zaremba,* for appellee Damschroeder Noe.

HANDWORK, J. This case is before the court on appeal from a judgment of the Wood County Court of Common Pleas.

## I

The essential facts may be summarized as follows. In July 1975 and May 1976, two promissory notes in the respective principal amounts of $650,000 and $75,000 were executed by Perry's Landing, Inc., an Ohio corporation and defendant-appellee herein. The notes were signed on behalf of appellee by its president, William R. Wumer. Appellee Perry's Landing was formed for the purpose of developing and managing a retail shopping center which was constructed on certain real estate located in Perrysburg, Ohio. Appellee leased space within the shopping center to various retail merchants. Plaintiff-appellant, First Federal Savings & Loan Association of Toledo (hereinafter "First Federal" or "appellant"), was the lending institution involved in these transactions. The loans obtained from First Federal, for which the promissory notes were executed, were to be repaid from rental income accruing from the long-term commercial leases. Interest on each principal loan was set at ten percent per annum and each note was accompanied and secured by a mortgage covering said commercial property.

Paragraph 8 of each mortgage, which is commonly referred to as a "due-on-sale clause," provides as follows:

"*If* there shall be *any change in the ownership of the premises* covered by this mortgage, *made without the consent of the Grantee* [appellant First Federal], the entire principal and interest accrued thereon shall become due and payable immediately at the election of the Grantee." (Emphasis added.)

Appellee also obtained loans from two other lending institutions, First Federal Savings & Loan Association of Wood County and Sylvania Savings Bank. A mortgage agreement was executed in conjunction with each loan to secure its repayment.

In 1980, Wumer apparently decided that he no longer wished to manage commercial real estate. He began looking for a buyer who had experience in managing such property and who would be willing to make a commitment to purchase it within a specific time period.

In early January 1981, Wumer, through his attorneys, contacted John N. Waldvogel, who is an executive vice-president for First Federal. It was indicated to Waldvogel that Perry's Landing intended to sell the secured commercial property to Perry's Landing of Michigan, a Michigan general partnership unrelated to Wumer's corporation of the same name. The conversation between Wumer's attorneys and Waldvogel was apparently conducted over the telephone. The trial court's finding with respect to this conversation is as follows:

"Mr. Waldvogel explained that [appellant] First Federal had never accelerated a mortgage based solely on the due-on-sale clause, but that that practice was currently under review by * * * [appellant's] Board of Directors. Though * * * [appellant] had never accelerated a mortgage under these circumstances before, * * * [it] had also made it a practice to decline any waiver request concerning due-on-sale clauses."

Appellee thereafter obtained from Sylvania Savings Bank and First Federal Savings & Loan Association of Wood County written waivers of their rights to enforce the due-on-sale clauses contained in their respective mortgage agreements. On January 12, 1981, Wumer's attorneys hand-delivered a letter to Waldvogel which stated, in pertinent part:

"This is to advise you that Borrower [appellee Perry's Landing] will enter into a land installment contract on January 12, 1981, for the sale of the mortgaged premises and more to a Michigan general

partnership. Counsel for the land contract vendee requested that we give you notice of the pending transaction. Mr. John N. Waldvogel, Executive Vice President, has informed us that the present attitude of First Federal has been not to accelerate a loan under the * * * [due-on-sale clause] in instances involving a land installment contract, and we are proceeding with the transaction on the basis of this conversation."

On the same day that Waldvogel received the foregoing letter, January 12, appellee executed a land installment contract with Perry's Landing of Michigan for conveyance of the mortgaged commercial property. The contract was subsequently recorded on January 13, 1981. The trial court appears to have concluded, implicitly, that the execution of the land contract constituted a "change in the ownership of the premises" so as to trigger the due-on-sale clause in Paragraph 8 of the First Federal-Perry's Landing mortgage agreements. If in fact the trial court so concluded, it was correct.[1]

Included in Section 7 of the land installment contract, entitled "Mortgage and Pending Orders of a Public Agency," was the following provision:

"* * * In the event that First Federal

Savings & Loan Association of Toledo should ever obtain a foreclosure judgment against Seller [appellee Perry's Landing] under either of its mortgages, Buyer [Perry's Landing of Michigan] may rescind this contract and recover the Three Hundred Thousand and 00/100 Dollar ($300,000.00) payment hereunder."

Some two weeks after Waldvogel received appellee's letter, First Federal's attorney, in response, sent Wumer's attorneys a letter (dated January 26, 1981), which states, in pertinent part:

"Because of the transfer of ownership, we are hereby requesting a meeting with you and the land contract vendees [Perry's Landing of Michigan]. *The purpose of the meeting will be to discuss an increase in the [interest] rate on these two mortgages.* As I am sure you and your clients are aware, at this period of high interest rates, when we are paying in excess of 14% to our depositors, we cannot afford, for a very long period, to have our money outstanding at 10½%.

"In your letter [of January 12, 1981] you refer to a conversation with Mr. Waldvogel regarding First Federal's policy on invoking the provisions of Paragraph 8 of our mortgage. However, let me advise you that Mr. Waldvogel

---

[1] Appellee has suggested that the land installment contract does not constitute a "change in * * * ownership." This contention is without merit. By the terms of the land contract, appellee agreed to sell and the Michigan partnership agreed to buy the commercial property secured by the First Federal-Perry's Landing mortgage agreements for an aggregate price of $2,300,000. Essentially, the contract called for a down payment of $300,000 with consecutive monthly payments of interest on the outstanding balance of the principal sum at the rate of nine percent per annum. At the end of ten years, the contract requires the entire outstanding principal balance to be paid in full. When this occurs, the contract requires appellee to convey legal title to the property to Perry's Landing of Michigan. Until that time, appellee is required to continue to make timely monthly mortgage payments. Thus, Perry's Landing of Michigan, as the contract vendee, may be said to have acquired a contract right to the title if it does not default on payment of the balance to appellee. Under the land contract, the Michigan partnership also acquires an immediate right to possession of the mortgaged property and the right to receive all rental income from the commercial tenants. The partnership, in turn, must pay the taxes and the costs of any utility services. It must also maintain the property in good repair and is required to procure and keep property insurance. We therefore find that the execution of the land contract clearly constituted a "change in the ownership" of the mortgaged property within the meaning of Paragraph 8 of the First Federal-Perry's Landing mortgage agreements. By the terms of the land installment contract, Perry's Landing of Michigan acquired a vested, equitable right to title.

distinctly remembers telling you that the past policy was being discussed and considered and that he could give you no assurance that it would not change." (Emphasis added.)

Upon receiving this letter, appellee's attorneys telephoned First Federal's attorney, Fred E. Henning, and stated that there was nothing to discuss or renegotiate with respect to the interest rate on the promissory notes. They consequently refused to meet with Henning. Between January 12, the date the land contract was executed, and April 2, the date appellant filed its complaint in this case, appellee continued to make monthly mortgage payments and First Federal continued to accept these payments. The trial court found that "up to the present time, * * * [appellee] has remained solvent and has at no time been in default of its obligation to * * * [First Federal]." The record indicates that First Federal accepted mortgage payments tendered on January 15, February 17, and March 16, 1981. First Federal concedes that appellee has never breached any other condition of the mortgage agreements. Nor has First Federal suggested that the property securing its loans is in any way impaired. As noted, First Federal filed its foreclosure suit on April 2, 1981. On April 10, it refused to accept appellee's mortgage payment. Appellee has tendered payment each month since this initial refusal, but First Federal continues to refuse all payments to date. Appellee subsequently filed an answer and a counterclaim which alleged wrongful foreclosure and prayed for attorney fees and costs.

On January 2, 1982, both parties filed motions for summary judgment, accompanied by memoranda in support thereof. On March 10, 1982, the trial court granted summary judgment in favor of appellee Perry's Landing and dismissed First Federal's complaint. First Federal thereafter appealed, but because the trial court failed to adjudicate · appellee's counterclaim, we found that Civ. R. 54(B) had not been complied with and dismissed the appeal for lack of a final, appealable order. On remand, each party filed motions for summary judgment on the counterclaim. In addition, First Federal filed a motion for reconsideration. On January 6, 1983, the trial court denied appellee's motion for summary judgment, granted summary judgment in favor of First Federal on the counterclaim and dismissed the same. The court further denied First Federal's motion for reconsideration. From said judgment, appellant brings this appeal.

Appellant sets forth two assignments of error, which are as follows:

"FIRST: The Trial Court erred in granting Defendant-Appellee's Motion for Summary Judgment and applying the defense of equitable estoppel in the case at bar.

"SECOND: The Trial Court's judgment was against the manifest weight of the evidence and is contrary to law."

Appellee, as cross-appellant, has appealed from the trial court's denial of its counterclaim, and sets forth the following assignment of error:

"For its assignment of error, Perry's Landing states that the trial court's denial of its counterclaim is contrary to law."

## II

In its arguments before the trial court, First Federal urged the court to find that the United States Supreme Court's recent decision in *Fidelity Federal S. & L. Assn.* v. *De La Cuesta* (1982), 458 U.S. 141, was retroactively applicable to mortgage agreements involving federal savings and loan associations entered into prior to the date of that decision. In this appeal, First Federal does not pursue the retroactivity argument as such, but contends instead that the decision at least gives federal savings and loan associations the unfettered right to exercise and enforce due-on-sale provi-

sions contained in mortgage agreements. Inasmuch as appellant has intimated that a federal issue is involved, we will briefly address that suggestion.

In *Fidelity Federal S. & L. Assn.* v. *De La Cuesta, supra,* the United States Supreme Court held that federal regulations, promulgated by the Federal Home Loan Bank Board (the "board"), which have the force of federal law and which permit federally chartered savings and loan associations to exercise their rights under due-on-sale clauses, preempt contrary state law where it limits or prohibits the enforcement of these clauses. This is the bare holding of the case. The court did not determine, however, whether the board's regulations "occupy the field of *due-on-sale law* or the *entire* field of federal savings and loan regulation." (Emphasis added.) *Fidelity Federal S. & L. Assn.* v. *De La Cuesta, supra,* at 159, fn. 14.

More importantly, the Supreme Court found that there was an "actual conflict" between the state law doctrine at issue — California's *Wellenkamp* doctrine (see *Wellenkamp* v. *Bank of America* [1978], 21 Cal. 3d 943, 148 Cal. Rptr. 379, 582 P. 2d 970) — and the regulations issued by the board, in particular, Section 545.8-3(f), Title 12, C.F.R. (1982). This regulation became effective July 31, 1976, and provides, in pertinent part:

"* * * [A federal savings and loan] association continues to have the power to include, as a matter of contract between it and the borrower, a provision in its loan instrument whereby the association may, at its option, declare immediately due and payable sums secured by the association's security instrument if all or any part of the real property securing the loan is sold or transferred by the borrower without the association's prior written consent. Except as * * * [otherwise] provided in * * * this section * * *, exercise by the association of such option (hereafter called a due-on-sale clause) shall be exclusively governed by the terms of the loan contract, and all rights and remedies of the association and borrower shall be fixed and governed by that contract."

California's *Wellenkamp* doctrine was designed to circumvent unreasonable restraints on the free alienability of mortgaged property. It prohibited a lending institution from enforcing a due-on-sale clause "unless the lender * * * [could first] demonstrate that enforcement * * * [was] reasonably necessary to protect against impairment to its security or the risk of default." *Wellenkamp* v. *Bank of America, supra,* 21 Cal. 3d at 953, 148 Cal. Rptr. at 385-386, 582 P. 2d at 977. The Supreme Court concluded that the federal regulations were *"meant to preempt conflicting state limitations* on the due-on-sale practices of federal savings and loans, and that * * * [California's *Wellenkamp* doctrine] *create[d] such a conflict."* (Emphasis added.) *Fidelity Federal S. & L. Assn.* v. *De La Cuesta, supra,* at 159.

Ohio has no analogous *Wellenkamp* doctrine.[2] In fact, due-on-sale clauses

---

[2] The United States Supreme Court also observed that the *Wellenkamp* doctrine "explicitly bar[red] a federal savings and loan from exercising a due-on-sale clause to adjust a long-term mortgage's interest rate towards current market rates — a due-on-sale practice the Board has approved and views as critical to 'the financial stability of the association.' " *Fidelity Federal S. & L. Assn.* v. *De La Cuesta* (1982), 458 U.S. 141, 156.

In the case before us, Henning's letter of January 26, 1981, unequivocally indicates First Federal's intention to minimize the adverse consequences of rising interest rates, then "in excess of 14 per cent," by using the due-on-sale clause as a means to upgrade the bank's loan portfolio. The practice of enforcing due-on-sale clauses in this manner has not gone without criticism. Typically, lending institutions employ the clause's acceleration terms to remove from their portfolios undesirably low interest rates on mortgage loans by "negoti-

were held valid and enforceable without restriction over ten years ago by this court in *People's Sav. Assn.* v. *Standard Industries* (1970), 22 Ohio App. 2d 35 [51 O.O.2d 43]. In *Great Northern Savings Co.* v. *Ingarra* (1981), 66 Ohio St. 2d 503, 507 [20 O.O.3d 415], the Ohio Supreme Court, at least implicitly, recognized the basic validity and enforceability of such clauses. The Supreme Court's application of the long-recognized, well-settled principle of equitable estoppel in the *Ingarra* case is not inconsistent with the general enforceability of due-on-sale clauses. Nor can equitable estoppel, as applied in that case, be mechanically labeled "a contrary state law doctrine" within the meaning of *Fidelity Federal S. & L. Assn.* v. *De La Cuesta.* Accord *First Federal S. & L. Assn.* v. *Lockwood* (Fla. App. 1980), 385 So. 2d 156, 160 ("The true issue before us is * * * whether the due-on-sale clause

must be automatically enforced by a state court without regard to traditional principles of equity * * *. We answer * * * [that] question by stating that a plaintiff who initiates a [foreclosure] suit in equity must be subject to *all* of the applicable consequences of that action and not merely those to which he chooses to submit.")

In short, since the Ohio decisions involving due-on-sale clauses do not in any way conflict with the federal regulations discussed in the *De La Cuesta* opinion, there is nothing for those regulations to preempt. See *Fidelity Federal S. & L. Assn.* v. *De La Cuesta, supra,* at 154-159. Regarding the issue of the retroactive application of federal regulations, we find no indication whatsoever in the *De La Cuesta* decision that the United States Supreme Court intended its holding to apply to mortgage agreements executed prior to the effective date of the pertinent regulations.

---

ating" a higher interest rate — one which more accurately reflects the prevailing market rate — in exchange for waiving enforcement of the clause. As one court has observed:

"The lenders are not favored creatures of the law, at least as compared to borrowers. They must dot the 'i's and cross the 't's. The due-on-sale clause sometimes evokes strong feelings. * * * [Examples include] 'a loan shark's trap for the unwary borrower,' * * * 'sheer extortion,' * * *.

"If the interest rates go much higher, the legal profession may have to cede to lenders precedence in Shakespeare's trenchant line: 'The first thing we do, let's kill all the lawyers.'

"Nevertheless, the lenders have legal rights, too. If they have complied with all requirements of the law, they are entitled to enforce their due-on-sale clauses, for they are simply not restraints on alienation.

"In the economics of the moment, the most evident target is obviously the right of the lender to call when, interest rates having risen, it is to its advantage to terminate the loan, and relend the accelerated principal at better rates. It is in such contexts of something elsewhere rotten in the State of Denmark that lenders have been denied the right to activate due-on-

sale clauses." *Williams* v. *First Federal S. & L. Assn.* (C.A. 4, 1981), 651 F. 2d 910, 926.

Indeed, "in the economics of the moment," it becomes all too easy to suffer economic myopia and disregard other protections afforded lenders by due-on-sale clauses. The clauses serve to protect lenders from the unanticipated, unbargained-for risks associated with the transfers of mortgaged property. Among other things, due-on-sale clauses protect the justified interest of lenders in ensuring that a responsible party assumes control and possession of the property. This interest was identified and approved as a prudent business practice in *People's Sav. Assn.* v. *Standard Industries* (1970), 22 Ohio App. 2d 35 [51 O.O.2d 43], where the court said, at 38:

"[A] significant element in the mortgage contract is the mortgagor himself, his financial responsibility and his personal attitudes. The right of the mortgagee to protect its security by maintaining control over the identity and financial responsibility of the purchaser is a legitimate business objective * * *."

More importantly, specific decisions as to the creditworthiness of the mortgagor's transferee are, in reality, financial evaluations better left to the experience and judgment of investment and banking professionals.

In the present case, the mortgage agreements were executed in July 1975 and May 1976. Section 545.8-3(f), Title 12, C.F.R. became effective, as noted, on July 31, 1976. The Supreme Court observed that the decision in *Wellenkamp* v. *Bank of America* was handed down in 1978, two years *after* the regulation was in effect. The court found that the California doctrine was "pre-empted by a *previously* promulgated federal regulation." (Emphasis added.) *Fidelity Federal S. & L. Assn.* v. *De La Cuesta, supra,* at 171, fn. 24. The court further observed that before 1978, California, like Ohio, "permitted the unrestricted exercise of due-on-sale clauses in cases of outright transfers of the * * * [secured property]." *Id.* In light of this, the *De La Cuesta* court stated that its decision, in effect, only nullified the *conflicting Wellenkamp* doctrine, not previous California law actually consistent with Section 545.8-3(f) or in force prior to its promulgation. Accordingly, we conclude that the Supreme Court's decision in *Fidelity Federal S. & L. Assn.* v. *De La Cuesta* does not affect disposition of this case on the basis of Ohio law.

## III

### A

The present case involves issues sufficiently important to warrant some preliminary observations on the analytic framework appropriate to cases of the type *sub judice.*

Two vigorous, sometimes conflicting policies compete for predominance in our law. The litigation produced as a consequence is not uncommon, nor are the legal issues unresolvable, once the nature of the conflict is properly understood. Fundamentally, the confrontation is not between lender and borrower or between mortgagee and mortgagor. The apparent antagonism in those relationships is only a surface manifestation of a deeper, systemic tension. Cf. *Dunham* v. *Ware Sav. Bank* (Mass. 1981), 423 N.E. 2d 998, 1003-1004. The genuine conflict is between freedom of alienation and freedom of contract: the ability to transfer property free from unreasonable restraints thereon versus the liberty of parties to enter into voluntary, binding agreements and to expect enforcement of bargained-for rights.[3] It has been suggested that the

---

[3] Much has been said of Judge Rutherford's dissent in *Great Northern Savings Co.* v. *Ingarra* (1981), 66 Ohio St. 2d 503, 509 [20 O.O.3d 415]. The parties to this appeal have referred to his staunch advocacy of freedom of contract as not inconsistent with their own positions. In dissent, Judge Rutherford made the following observations, at 512-513:

"The liberty to contract is a foundation of doing business. Such liberty ought not to be emasculated by the courts by enabling competent parties to escape their contractual obligations on the pretext of public policy unless the preservation of public welfare imperatively so demands.

"Conduct of a mortgagee sufficiently unconscionable and inequitable as to effect a direct or indirect restraint on alienation might, if sufficient, render provision for increased interest on sale contained in a mortgage against public policy, such as to entitle the mortgagor

to relief. Such unconscionable or inequitable conduct or direct or indirect restraint on alienation does not, however, appear from the provision for a two percent increase in interest in this case."

Read carefully and in context, Judge Rutherford's opinion is not so much a dissent based upon the law as it is a dissent based upon *the facts.* This is especially so in light of his interpretation of the contract right of Great Northern to elect to increase by two percent the interest rate on the mortgage loans, once the pertinent provision was triggered. See *id.* at 512. In any event, Judge Rutherford assessed the case from the analytic perspective of freedom of contract, whereas the Court of Appeals for Summit County had considered the mortgage provision in question from the perspective of freedom of alienation, and had held it to be an unlawful restraint on the alienability of the mortgaged property. As the text of our opinion *sub judice* indicates, a con-

weight of authority favors freedom of alienation. See, generally, Annotation (1976), 69 A.L.R. 3d 713, 724, 731-737.

As a general matter, of course, the law disfavors restraints on alienation, unless reasonable, and in close cases that construction will be adopted which most favors free alienability and the right to convey. *Anderson* v. *Cary* (1881), 36 Ohio St. 506, 515; *Hamilton* v. *Link-Hellmuth, Inc.* (1957), 104 Ohio App. 1 [4 O.O.2d 58]; *Wayne Lakes Park, Inc.* v. *Warner* (1957), 104 Ohio App. 167, 172 [4 O.O.2d 235]; 42 Ohio Jurisprudence 2d (1960) 504, Perpetuities and Restraints on Alienation, Section 57 *et seq.;* cf. *Quarto Mining Co.* v. *Litman* (1975), 42 Ohio St. 2d 73, 76-78 [71 O.O.2d 58].

In some nebulous sense, however, all agreements involving real property — including mortgages — "restrain" alienability, given how the particular terms and conditions of those agreements may affect subsequent transfers or dispositions of the property. Cf. *Raisch* v. *Schuster* (1975), 47 Ohio App. 2d 98. That a due-on-sale clause is a "restraint" is more often than not a dubious, unexplored assumption. In fact, of course, not every due-on-sale clause is a "restraint" on alienability, as that concept has come to be understood. In this case, we are not satisfied that the clause in question falls within any of the traditional classifications of restraints on alienation.[4] See Restatement of the Law, Property (1944),

---

tractual analysis is the more accurate and useful approach to disputed provisions of mortgage agreements.

[4] The Restatement of the Law, Property (1944), Section 404, defines and classifies a "restraint on alienation" as follows:

"§ 404. DEFINITIONS.

"(1) A restraint on alienation, as that phrase is used in this Restatement, is an attempt by an otherwise effective conveyance or contract to cause a later conveyance

"(a) to be void; or

"(b) to impose contractual liability on the one who makes the later conveyance when such liability results from a breach of an agreement not to convey; or

"(c) to terminate or subject to termination all or a part of the property interest conveyed.

"(2) If a restraint on alienation is of the type described in Subsection (1), Clause (a), it is a disabling restraint.

"(3) If a restraint on alienation is of the type described in Subsection (1), Clause (b), it is a promissory restraint.

"(4) If a restraint on alienation is of the type described in Subsection (1), Clause (c), it is a forfeiture restraint."

The due-on-sale clause in this case quite clearly does not void any subsequent conveyance and is therefore not a disabling restraint. See Restatement of the Law, Property, *supra,* at 2384, comment *f.* Similarly, transfer or sale

of the property does not operate to forfeit title or otherwise extinguish any interest in the mortgaged property. Thus, the clause is not a forfeiture restraint. This leaves only the question of whether it constitutes a promissory restraint. To be a promissory restraint, the clause must "impose contractual liability" for a later conveyance when "liability results from *a breach of an agreement not to convey.*" (Emphasis added.) Accordingly, a promissory restraint exists only if the clause contains *an agreement not to convey* the mortgaged property.

Here, of course, there was no such agreement, and none can be implied from the language of Paragraph 8. The wording of the clause is conditional; only if a change in ownership occurs without First Federal's consent is its right to elect to accelerate the outstanding debt triggered. Nor was there *an agreement not to convey without the consent* of First Federal. See Restatement of the Law, Property, *supra,* 2385, comment *g.* Again, the clause is conditional. It does not say that appellee has agreed not to convey the property without First Federal's consent. Rather, if appellee chooses to sell the property, it must first obtain the bank's consent to avoid triggering the bank's right to accelerate the loan. The land contract with Perry's Landing of Michigan was executed without First Federal's consent. This did not breach any agreement not to convey the property, but merely gave First Federal

Section 404; *Occidental S. & L. Assn.* v. *Venco Partnership* (1980), 206 Neb. 469, 472-476, 293 N.W. 2d 843, 845-848; *Sonny Arnold, Inc.* v. *Sentry Sav. Assn.* (Tex. 1982), 633 S.W. 2d 811, 813-815.

Mortgages, being voluntary security agreements incident or collateral to a primary obligation, are susceptible to the same rules of interpretation and the same framework of analysis which apply to contracts generally. 37 Ohio Jurisprudence 2d (1959) 240-243, Mortgages, Sections 49-50; see, also, *Sonny Arnold, Inc.* v. *Sentry Sav. Assn., supra*, at 815-816; *Occidental S. & L. Assn.* v. *Venco Partnership, supra*, at 849; 69 A.L.R. 3d, *supra*, at 725. Consequently, our analysis in this case proceeds from settled contract principles.

An approach consistent with freedom of contract recognizes the rights of parties to enter into binding mortgage agreements with full knowledge of the terms and conditions. Accordingly, the parties may contract as they please, so long as the resulting terms and conditions of the mortgage do not offend public policy and are not illegal. As we have said, due-on-sale clauses are neither void nor against public policy. *People's Sav. Assn.* v. *Standard Industries, supra*. Nevertheless, the enforcement of due-on-sale clauses, as with other contract provisions, is subject to traditional contract defenses, including *equitable defenses*. This is essentially what the *Ingarra* court held on the facts of that case. *Great Northern Savings Co.* v. *Ingarra, supra*, at 507-508. Here, appellant's foreclosure suit seeks equitable relief. It was long ago said that he who

the right to declare the unpaid balance of the mortgage due and owing, if it so chose to exercise that right. There is therefore no restraint on the actual transfer of the property. Appellee is quite free to convey it by land contract, though undoubtedly the possibility of acceleration may inhibit sale of the property or, at least, appellee's ability to sell the property as it wishes. But not every impediment to a property transfer is necessarily a "restraint" on alienability. As one commentator has observed:

"To label the loss of a purported favorable economic position [*i.e.*, the mortgagor's low-interest mortgage loan] as a restraint on alienation is a misconception of that doctrine, which was not intended to provide profitability of alienation, *but only the ability to alienate without penalty*." (Emphasis added.) Note, Enforcement of Due-On-Transfer Clauses (1978), 13 Real Property, Probate and Trust Journal 891, 926.

See, also, *Miller* v. *Pacific First Federal S. & L. Assn.* (1976), 86 Wash. 2d 401, 404-405, 545 P. 2d 546, 548-549.

In point of fact, a due-on-sale clause may actually operate to remove an encumbrance on the property, that is, *the mortgage as a lien*, which would otherwise directly affect its alienability. If enforcement of the clause would remove an encumbrance, this makes the property *more* alienable, not less. See, generally, Kinzler, Due-on-Sale Clauses: The Economic and Legal Issues (1982), 43 U. Pitt. L. Rev. 441, 446. In any event, that the clause in question operates as a contractual disincentive to sale or that it may impede the property's *marketability* is irrelevant to the *legal* question of whether the clause directly restrains alienability. We have concluded that the due-on-sale clause in this case does not do so because it is not a "restraint."

Even courts which have held due-on-sale clauses to be "restraints" on alienation have conceded the difficulty of fitting such clauses within the Restatement's definition. See, *e.g.*, *Nichols* v. *Ann Arbor Federal S. & L. Assn.* (1977), 73 Mich. App. 163, 165-166, 250 N.W. 2d 804, 805:

"Strictly speaking, * * * the 'due-on-sale' clause in question does not fit within the definition of a restraint on alienation found in the *Restatement*. * * * Neither expressly nor by implication does it prohibit * * * [the mortgagors] from alienating their interest."

This acknowledgment only highlights further the anomaly of such cases when the court decides, nonetheless, to expand the Restatement's definition and find, in a plainly worded contract clause providing for agreed-upon rights, an "unreasonable restraint" on alienation.

seeks equity must do equity. See 41 Ohio Jurisprudence 3d (1983) 370, Equity, Section 66. Equitable estoppel, if shown, will prevent the enforcement of a valid mortgage contract or provision thereof, such as a due-on-sale clause. The question in this case is whether the facts are such that equity will interpose that remedy to preclude appellant from asserting its otherwise valid contract right.

B

The trial court found that Waldvogel had been "equivocal" in communicating First Federal's policy regarding the exercise of its right to accelerate the outstanding mortgage payments under the due-on-sale clause. The court determined that Waldvogel's statement about First Federal's policy was unsatisfactory. The court also found that First Federal "remained silent for three months" after appellee executed the land installment contract. Although the court explicitly declined to find that First Federal's unresponsiveness during those three months was *per se* unreasonable, it did conclude, upon considering all the circumstances, that the three-month delay in responding was unreasonable. In particular, the court cited First Federal's knowledge of appellee's intent to execute the land contract and found that its "silence" for three months "promoted" reliance. The court concluded that "it is unreasonable for * * * [First Federal] to maintain that property-holders and businessmen [must] simply suspend indefinitely all ideas of property transaction until a lending institution makes up its mind about a specific policy."

The trial court followed the Supreme Court's formulation of equitable estoppel in *Great Northern Savings Co.* v. *Ingarra, supra.* The *Ingarra* court adopted the definition of "estoppel" as recited in the case of *In re Estate of Basmajian* (1944), 142 Ohio St. 483 [27 O.O. 410], which is as follows:

"An estoppel arises where one is concerned in or does an act which in equity and good conscience will preclude him from averring anything to the contrary, as where another has been innocently misled into some injurious change of position." *Id.* at 494.

No single formulation of the equitable doctrine of estoppel is applicable to every case, and in applying estoppel, each case must be considered on its own facts. *Hampshire Cty. Trust Co.* v. *Stevenson* (1926), 114 Ohio St. 1, 11; *Morgenthaler* v. *Cohen* (1921), 103 Ohio St. 328, 342. Unfortunately, the *Basmajian* case does not provide the most lucid statement of estoppel available.

In contrast, First Federal would have us hold that a knowingly false representation or concealment of material fact is the essential element of estoppel. That element, however, is more properly a decisive ingredient of misrepresentation, not estoppel, and we decline so to hold. See Restatement of the Law 2d, Contracts (1981) 426, Misrepresentation, Section 159 *et seq.*; 3 Pomeroy, Equity Jurisprudence (5 Ed. 1941) 192-194, Section 805; cf. *Markese* v. *Ellis* (1967), 11 Ohio App. 2d 160, 164 [40 O.O.2d 313] ("Proof of fraud, in its strict sense, is not always necessary for estoppel, and one may be held responsible for words or act[s] which he knows, or ought to know, will be acted upon by another."). As one authority has stated:

"Discussions of estoppel often mention fraud, and sometimes courts define estoppel to include a number of the elements of actionable deceit. * * * However, estoppel is not actionable fraud and it is not treated like actionable fraud. There is usually no need for scienter, an intent to deceive, in estoppel cases, for example. Furthermore, estoppel is, according to the usual statement, a shield, not a sword. It does not furnish a basis for damages claims, but a defense against the claim of the stopped party.

"Nor is estoppel regarded as necessarily involving any promise in the

conventional sense. * * *" Dobbs, The Law of Remedies (1973) 42, Section 2.3.

It has also been observed that:

"* * * [U]nder the modern doctrine of estoppel a misrepresentation of fact is *not* necessary — a promise or an innocent representation of fact being sufficient to form the basis of an estoppel, whether it be denominated 'equitable' or 'promissory.' Under this view actual fraud, bad faith or intent to deceive is *not* essential." Calamari & Perillo, Contracts (1977) 445-446, Section 11-34. (Emphasis added.)

The concept of estoppel has its roots in ethical premises and is the legal expression of normative policies that equity jurisprudence has fostered and developed over the centuries. In essence, the expression of estoppel in the form of a rule is that one party will not be permitted to deny that which, by his words, his acts, or his silence (when there was an obligation to speak), he has induced a second party reasonably and in good faith to assume and rely upon to that party's prejudice or pecuniary disadvantage. See, generally, 42 Ohio Jurisprudence 3d 56, 62-66, Estoppel, Sections 36-46 (and cases cited therein); see, also, 3 Pomeroy, *supra,* Section 805. Distillable from the foregoing rule are the following four essential elements.[5]

First, there must be something in the nature of a *representation* by words, acts, or silence. The representation must be factual, not promissory, or else the elements and analysis appropriate to a *promissory* estoppel context may apply. See *Mazer* v. *Jackson Ins. Agency* (Ala. 1976), 340 So. 2d 770, 772-773. The facts underlying the representation must be *known* to the party at the time he makes it, or at least the circumstances must be such that he is necessarily chargeable with knowledge of them. In addition, if silence is involved, it amounts to a representation only if the circumstances were such that the law recognized a duty to speak. Cf. 3A Wigmore, Evidence (Chadbourn Rev. 1970) 1056-1058, Section 1042. Second, the representation must communicate some fact or state of affairs in a *misleading* way. Third, the representation must induce actual reliance by the second party, and such reliance must be *reasonable under the circumstances and made in good faith.* Fourth, the relying party would suffer prejudice or pecuniary disadvantage if the party whose representation was relied upon were not estopped or precluded from asserting an otherwise valid right in contradiction to his earlier representation.

In assessing these four elements in the context of a particular case, relevant factors include: (a) the nature of the

---

[5] Our holding with respect to the elements of equitable estoppel is consonant with the rendition given in Dobbs, The Law of Remedies (1973), Section 2.3, wherein it is stated, at 42:

"An estoppel case * * * has three important elements. The actor, who usually must have knowledge of the true facts, communicates something in a misleading way, either by words, conduct or silence. The other relies upon that communication. And the other would be harmed materially if the actor is later permitted to assert any claim inconsistent with his earlier conduct."

See, also, Pomeroy, Equity Jurisprudence (5 Ed. 1941), Section 805.

Representative Ohio cases, from which the elements set forth in the text can be gleaned, and which illustrate those elements generally recognized and traditionally associated with estoppel, are as follows: *Hampshire Cty. Trust Co.* v. *Stevenson* (1926), 114 Ohio St. 1; *Morgenthaler* v. *Cohen* (1921), 103 Ohio St. 328, 342; *Kelley* v. *Hazzard* (1917), 96 Ohio St. 19, 22; *Shinew* v. *First Natl. Bank* (1911), 84 Ohio St. 297; *Kroll* v. *Close* (1910), 82 Ohio St. 190, 194-195; *Ensel* v. *Levy & Bro.* (1889), 46 Ohio St. 255, 259-60; *Civilian Defense, Inc.* v. *Ross* (App. 1958), 78 Ohio Law Abs. 172, 173; *Glass* v. *Glass* (App. 1952), 69 Ohio Law Abs. 333, 335; *West* v. *Cleveland Ry. Co.* (App. 1944), 41 Ohio Law Abs. 554, 559; *Fleming* v. *Steubenville* (1931), 44 Ohio App. 121, 126-127.

representation; (b) whether the representation was in fact misleading; (c) the relative knowledge and experience of the parties; (d) whether the representation was made with the intent that it be relied upon; and (e) the reasonableness and good faith of the reliance, given all the facts and circumstances.

On the facts of this case, we conclude that the trial court erred in granting summary judgment in favor of appellee Perry's Landing. Summary judgment is appropriately granted only if a tripartite determination is made: (1) that there is no genuine issue as to any material facts; (2) that the moving party is entitled to judgment as a matter of law; and (3) that reasonable minds can come to but one conclusion, and that conclusion is adverse to the party against whom the motion for summary judgment is made, who is entitled to have the evidence construed most strongly in his favor. See *Harless v. Willis Day Warehousing Co.* (1978), 54 Ohio St. 2d 64, 66 [8 O.O.3d 73]. The purpose of a motion for summary judgment is to dispose of a lawsuit in an expeditious manner when there is no disputed issue of material fact necessitating a trial on the merits. See *Siegler v. Batdorff* (1979), 63 Ohio App. 2d 76, 80 [17 O.O.3d 46].

The due-on-sale clause contained in Paragraph 8 of the First Federal-Perry's Landing mortgage agreement does not specify a time within which First Federal must assert its right to accelerate payment of the outstanding balance of the mortgage. We hold that, in the absence of a specified time, the lender has a *reasonable time* following the act or event by the borrower which triggers the terms of the clause to exercise its rights thereunder. Accord *Dunham v. Ware Sav. Bank, supra; Malouff v. Midland Fed. S. & L. Assn.* (1973), 181 Colo. 294, 509 P. 2d 1240; see, generally, 55 American Jurisprudence 2d (1971) 430-431, Mortgages, Sections 384 and 385.

Here, the triggering event occurred on January 12, 1981, when appellee executed the land contract with Perry's Landing of Michigan. While we agree with the trial court that First Federal had no right to expect appellee to wait "indefinitely" before entering into the land contract, this is obviously not what happened. Through its hand-delivered letter, appellee notified First Federal that it would be executing the land contract with the vendee only hours before doing so. Even if First Federal's board of directors desired to continue the bank's general policy of not enforcing due-on-sale clauses, such a decision would have been rendered moot by appellee's actions. Little more than *twelve days* elapsed, approximately, from the date Wumer's attorneys first contacted Waldvogel to the date appellee actually executed the land contract. It is unreasonable to expect First Federal to make such an important policy decision within that time. It would also belie the practical realities of the business and banking community to expect First Federal's board of directors to meet, review and effect a major policy change in so brief a time or on such short notice. We must respectfully disagree with the trial court's conclusion that delaying enforcement of the due-on-sale clause for three months was an unreasonably long delay. We hold that three months was not unreasonable under the circumstances of this case. See *Dunham v. Ware Sav. Bank, supra,* at 1000.

The mortgage agreements in this case were negotiated by experienced businessmen, and the record reveals no unconscionable conduct on First Federal's part in reaching the terms of those agreements. Furthermore, it is not at all clear that Waldvogel's statements were misleading or were intended to induce appellee to act in reliance on them. Appellee's reliance cannot be said to have been reasonable or in good faith if based upon ambiguous or uncertain statements. See 42 Ohio Jurisprudence 3d, *supra,* 109-110, Section 66.

Appellee, as well as the trial court,

has characterized Waldvogel's statements as evincing a "maybe we will enforce it, maybe we won't" position. If this is true, then appellee's argument for reasonable reliance becomes even weaker, for no reasonable person in appellee's position would rely on so patent an uncertainty as the basis for precipitating a two million dollar business transaction. In fact, Waldvogel's representations might actually be construed by a factfinder to indicate, unambiguously, that First Federal's past policy of not enforcing due-on-sale clauses was being reviewed in anticipation of prospective enforcement. Surely the more prudent course for appellee at that point would have been to wait a reasonable time and then secure a more definite statement before proceeding with the land contract.

The relative knowledge of the parties is also important. Because appellee clearly *knew* that First Federal might exercise its right to accelerate the maturity of the loan and, ultimately, to initiate foreclosure proceedings, appellee saw fit to include Section 7 in its land contract with Perry's Landing of Michigan. Section 7 provides for that contingency and allows said vendee to recover its down payment in the event First Federal obtains a foreclosure judgment against appellee.

Certainly there were disputed questions of material fact about which reasonable minds might conclude differently. *If* reasonable minds *could* conclude differently with respect to whether Waldvogel's statements in fact misled appellee and whether appellee's reliance on those statements was reasonable and in good faith, they clearly *might* resolve those questions in favor of First Federal. Thus, summary judgment was improperly granted. First Federal's first assignment of error is well-taken.

### C

In view of our disposition of the first assignment of error, the second assign- ment of error is now moot. Appellee, cross-appellant herein, submits that it has timely tendered all mortgage payments due under the First Federal-Perry's Landing mortgage agreements. In support of its assignment of error, appellee contends that since no condition of the mortgage agreements was breached, there is no basis to support appellant's foreclosure action. Appellee argues that First Federal is therefore liable in damages for wrongful foreclosure.

This assignment of error is without merit. First, since we have concluded that appellee's execution of its land contract with Perry's Landing of Michigan constitutes a "change in * * * ownership," there is at least a prima facie breach of the consent condition of Paragraph 8 of the First Federal-Perry's Landing mortgage agreements. First Federal's right to foreclose on the mortgages is predicated on the due-on-sale clauses, which appellee triggered by executing the land contract. Secondly, equitable estoppel operates as a shield, not a sword. Hence, damages for wrongful foreclosure cannot logically be sought by raising the defense of equitable estoppel, whether the same is successfully invoked or not. (On remand, it remains for the trier of fact to determine the equitable estoppel issues as herein indicated in III B of this opinion. See Civ. R. 39[C], regarding the use of an advisory jury.)

More to the point, appellee's counterclaim prays for "judgment against [appellant] in an amount not fully ascertainable at this time, *but which includes attorneys' fees* and all costs incurred herein. * * *" First Federal's foreclosure suit is, in essence, an equitable contract action. As a general rule, attorney fees (for either party) are not recoverable as damages in contract actions, unless there has been a substantial showing of bad faith or wrongful motives. See *Sorin* v. *Bd. of Edn.* (1976), 46 Ohio St. 2d 177, 181-183 [75 O.O.2d 224]; *Northern Ohio Sugar Co.* v. *Columbia Gas of Ohio, Inc.* (May 29, 1981), Huron App. No. H-80-31, unre-

148

ported. No such showing has been made in the record of this case. Accordingly, the trial court did not err in denying appellee's counterclaim. Appellee's sole cross-assignment of error is not well-taken.

On consideration whereof, this court finds that substantial justice has not been done the party complaining, and the judgment of the Wood County Court of Common Pleas is hereby reversed. This cause is remanded to said court for further proceedings not inconsistent with this opinion. Costs to abide final determination.

*Judgment reversed and cause remanded.*

CONNORS, P.J., and RESNICK, J., concur.