**In re COLUMBUS PLAZA, INC., Debtor.**

**Donald R. KENNEY, Plaintiff,**

**v.**

**COLUMBUS PLAZA, INC., et al., Defendants.**

**COLUMBUS PLAZA, INC., Plaintiff,**

**v.**

**Donald R. KENNEY, Defendant.**

**Bankruptcy No. 2–87–01860.
Adv. Nos. 2–87–0216, 2–87–0217.**

United States Bankruptcy Court, S.D. Ohio, E.D.

Aug. 20, 1987.

Nick V. Cavalieri, David R. Watkins, Arter & Hadden, Columbus, Ohio, Mark Schlachet, Cleveland, Ohio, for debtor Columbus Plaza.

Gary Hammond, Roetzel & Andress, Columbus, Ohio, John W. Zeiger, J. Kevin Cogan, Jones, Day, Reavis & Pogue, Columbus, Ohio, for plaintiff.

## OPINION, FINDINGS OF FACT, AND CONCLUSIONS OF LAW ON COMPLAINT FOR DECLARATORY JUDGMENT AND COMPLAINT FOR SPECIFIC PERFORMANCE

BARBARA J. SELLERS, Bankruptcy Judge.

This matter is before the Court upon two complaints, consolidated for hearing, arising in the Chapter 11 case of Columbus Plaza, Inc. ("Plaza"). The first complaint, adversary 2–87–0216 filed by Donald R. Kenney (the "Complaint"), seeks a declaratory judgment regarding Kenney's rights and liabilities under a certain agreement between Kenney and Plaza. The second complaint, adversary 2–87–0217 filed by Plaza (the "Counterclaim"), seeks a judgment compelling Kenney to specifically perform the purchase of certain real and personal property under the terms of that same agreement.

Because of certain time constraints upon Plaza and pursuant to an application, the answer times were reduced, and both complaints were consolidated and tried upon a greatly shortened schedule. By agreement of the parties and pursuant to Federal Rule of Civil Procedure 42 and Bankruptcy Rule 7042, Plaza's complaint was designated as a counterclaim to Kenney's complaint. Pursuant to motion, the counterclaim for damages asserted by Plaza in its answer to the complaint was bifurcated from the issues under consideration and was continued for trial at a later time. Nominal defendant Chicago Title Agency of Central Ohio, Inc. ("Chicago") was not heard in this matter.

The Court has jurisdiction over the Complaint and the Counterclaim pursuant to 28 U.S.C. § 2201, 28 U.S.C. § 1334(b), and the general order of reference entered in this district on July 30, 1984. Both the Complaint and the Counterclaim are proceedings which arose in a case under Title 11 and, therefore, are core proceedings pursuant to 28 U.S.C. § 157 (b)(2)(A), (B), (N) and (O). Both parties further consented to the entry of a final order by this Bankruptcy Judge. The terms of the agreement for which construction is sought provide for the application of Ohio law.

## FINDINGS OF FACT

The Court finds the following relevant facts from the testimony and review of the exhibits admitted into evidence.

On May 1, 1987, Plaza filed a Chapter 11 case in the United States Bankruptcy Court for the Southern District of Ohio, Eastern Division.

At the time of that bankruptcy filing, Plaza, under a lease with Hotel Associates, Limited ("HAL") was the operator of the Sheraton Columbus Plaza Hotel. The hotel, located at 50 North Third Street, Columbus, Ohio, is owned by HAL.

In conjunction with that lease, Plaza, as optionee, and HAL, as optionor, entered into an agreement on September 16, 1982, pursuant to which Plaza could purchase the hotel, all associated personal property and all related permits (the "Premises") for an agreed-upon price.

Prior to its bankruptcy filing, Plaza had attempted on at least two occasions to locate a buyer for the Premises so that Plaza could exercise its purchase option at what appeared to be a below-market price and resell the Premises to a third party.

On May 20, 1987, following a series of offers and counteroffers dating back to early 1987, Kenney and Michael Tsao, the authorized representative for Plaza, through their attorneys and real estate broker, Don Roberts, entered into a Real Estate and Business Assets Purchase Agreement (the "Agreement"). The Agreement, embodying a negotiated price term, was in a form drafted by Kenney's attorney and previously considered by Plaza. The essential terms of the Agreement called for Kenney to purchase the Premises for $13,500,-000, which included $260,000 to be paid by Plaza to Donald Roberts of the Brown Company as a brokerage commission.

Subject to forfeiture upon breach, Kenney also deposited the sum of $100,000 with escrow agent Chicago pending completion of the sale. Under the terms of the Agreement, prerequisite to that completion was the approval of this Court, following notice to all parties in interest in the bankruptcy case and hearing upon any objection.

In addition to the normal title evidences, surveys, tax prorations and other like representations and warranties, and to assure that Kenney purchased only the Premises and not Plaza's businesses, the Agreement obligated Plaza to terminate the business of the hotel prior to conclusion of the sale. Plaza obviously was also obligated first to acquire title to the Premises from HAL.

The Agreement granted Kenney the right to inspect the condition and character of the Premises and to determine, on or before June 15, 1987, that such character and conditions were satisfactory. Absent such satisfaction, Kenney's $100,000 deposit was to be returned to him, and the Agreement was to be terminated without future obligation or liability for either party. If the inspection contingencies were satisfied or waived, the closing of the sale was to occur within 45 days thereafter.

On May 29, 1987, William Tzagournis, the new president of Plaza, authorized Peter H. Luft, Realtors ("Luft"), as an agent for Plaza, to seek either a backup or primary buyer at a firm price of $15,000,000. Luft's efforts continued at a diligent pace until June 4, 1987, when such efforts were slowed at the request of Tsao and another officer of Plaza.

Following Kenney's execution of the Agreement on May 20, 1987, the parties proceeded to take various steps required under its terms. Specifically, the $100,000 deposit was received by Chicago on May 21, 1987, and Kenney took steps to have certain inspections made.

On June 15, 1987, Kenney notified Plaza of his waiver of inspection contingency set forth in Section 11(a) of the Agreement. Shortly thereafter, on June 26, 1987, Plaza filed a motion with this Court seeking authority to assume an executory contract to purchase the Premises and for authority to sell those Premises free and clear of liens. The motion, opposed by BancOhio National Bank and Local 70 of the Hotel and Restaurants Employees' Union, was first scheduled to be heard on July 21, 1987 and was actually heard on July 30, 1987.

Pursuant to a request from Michael Tsao, on behalf of Plaza, Roberts discussed with Kenney the status of Plaza's current leases and the operations of the hotel's garage. In response to those communications, Roberts advised Tsao, by letter dated June 30, 1987, that Kenney would not be assuming any of Plaza's lease obligations and that the garage must be closed prior to the completion of the sale in accordance with the Agreement.

By letter dated July 2, 1987, and pursuant to Section 6 of the Agreement, the attorney for Kenney notified the attorney for Plaza of certain objections to the title report and survey of the premises. That letter also suggested July 30, 1987 as the last possible closing date which would satisfy the terms of the Agreement.

In addition to the written communications relating to formal steps taken to implement the terms of the Agreement, the attorney for Plaza and the attorney for Kenney had discussions regarding the Agreement on May 27, 1987; June 11, 1987; June 23, 1987; June 25, 1987 and July 15, 1987.

On June 22, 1987, Kenney's attorney, Roberts, Tsao on behalf of Plaza, and two attorneys for Plaza met. That meeting addressed such issues as title requirements, removal of certain title encumbrances, the projected closing date, the need for details regarding existing leases, copies of existing permits, a listing of personal property, certain wording of the proposed motion seeking authorization to sell the Premises, and the mechanics of the deeding process to preserve certain tax advantages for Kenney. Discussions that day also covered the need to terminate the hotel's businesses prior to closing, including the termination of tenants and employees, because of concerns with possible suc-

cession to certain of Plaza's labor contracts.

In addition to the written contracts previously set forth, telephone contacts between counsel for each party, and the June 22nd meeting, Plaza also by notice, terminated some 80 per cent of its employees, cancelled convention and function bookings for dates after August 1, 1987, terminated certain business leases, cancelled transient patron and group patron bookings, arranged for a transfer of some of its patron business to other hotels, and performed other tasks associated with closing the hotel's businesses in preparation for the effectuation of the sale to Kenney.

By telephone contact from Kenney's attorney to Plaza's attorney on July 17, 1987, and by letter to Plaza dated July 21, 1987, the attorney for Kenney communicated Kenney's withdrawal from the purchase of the Premises. A notice of that withdrawal was also filed with the Bankruptcy Court. The reason given for the withdrawal was that economic projections, based upon information received from an architect and a developer friend, had indicated to Kenney that the combination of health clubs, shops, hotel rooms and residential quarters contemplated by the venture would not be profitable.

On July 22, 1987 Kenney filed the Complaint and Plaza filed the Counterclaim.

No probative evidence exists that Plaza would have been unable to perform or tender performance by the August 1, 1987 closing deadline other than the uncertainty brought about by the required resolution of the issues raised by these adversaries and the Court's need to rule on Plaza's motion seeking authority to assume the option contract and sell the Premises.

### ISSUES OF LAW

The dispute in these matters arises from two assertions by Kenney. First, he argues that he has no obligation to complete the sale contemplated by the Agreement and that he has the right to return of his deposit because the Agreement had not yet ripened into an enforceable contract. In the alternative, Kenney asserts that because he bargained only for performance in the alternative, his liability is limited to the forfeiture of his $100,000 deposit.

Plaza, on the other hand, asserts that Kenney has breached the Agreement, that it has no adequate remedy at law, and that Kenney should be required to specifically perform the Agreement. Plaza denies that Kenney's liability can be limited to $100,000 and argues that the deposit forfeiture clause is either security for performance, which has no effect upon other available rights upon default, or is a liquidated damaged provision which is void as a penalty. Plaza also maintains that Kenney is equitably estopped from denying the enforceability of the Agreement by specific performance, even if certain language is interpreted as precluding such remedy.

For purposes of these adversaries, the relevant portions of the Agreement are Sections 1, 3(b) and (c); 11; 12(i); 24 and 26. These sections state, in relevant part:

§ 1. PURCHASE AND SALE OF THE PREMISES. The Real Property, Personal Property and Assumed Permits are hereinafter collectively referred to as the Premises. It is the intention of the Buyer to buy only the Premises herein set forth and to not buy the Businesses. Therefore, as a condition precedent to Buyer performing, Seller agrees to terminate the Businesses prior to the date of closing.

§ 3. DEPOSIT. The Deposit paid by Buyer to Chicago Title Agency of Central Ohio, Inc ... shall be held by said Escrow Agent in a separate interest-bearing account in accordance with the following terms and conditions. If the purchase and sale of the Premises is ... (b) not consummated as a result of Buyer's breach under this Agreement, the Deposit, together with any interest earned on the Deposit, shall be paid to Seller as liquidated damages in full settlement of any and all rights or claims which Seller may have against Buyer as a result of such breach by Buyer; (c) not consummated as a result of Seller's breach of this Agreement, the Deposit, together with any interest earned on the

Deposit, shall immediately be returned to Buyer without prejudice, however, to any rights or claims Buyer may have against Seller as a result of such breach by Seller.

§ 11. BUYER'S CONTINGENCIES. This Agreement and the obligations of Buyer thereunder are contingent upon the satisfaction or waiver in writing by Buyer of the following contingencies within the time period hereinafter set forth.

(a) Inspection Contingency. Buyer determining on or before June 15, 1987 that the condition and character of the Premises are acceptable to Buyer. Buyer shall be permitted to make such physical, mechanical, architectural and engineering examinations of the premises as Buyer deems appropriate in order to determine the acceptability of the premises. Seller shall permit Buyer access to the premises so Buyer can make any such examinations. If the contingency set forth above is not satisfied or waived by Buyer in a written notice thereof to Seller within the respective time period set forth in this Section 11, then this Agreement shall automatically terminate. The Deposit, together with any interest earned on the Deposit, shall immediately be returned to Buyer and the parties thereafter shall be relieved of any further obligation or liability thereunder.

§ 12. REPRESENTATIONS AND WARRANTIES OF SELLER. For the purposes of inducing Buyer to enter into this Agreement and to consummate the purchase of the Premises in accordance herewith, Seller represents and warrants to Buyer as to the following:

(i) Corporate Authority. Aside from required Bankruptcy Court approval, Seller has the full right, power and authority to sell and convey the Premises to Buyer as provided in this Agreement and to carry out Seller's obligations hereunder.

§ 24. ENTIRETY AND AMENDMENTS. This Agreement embodies the entire agreement between the parties and supersedes all prior agreements and understandings of the parties, if any, relating to the Premises. This Agreement may be amended or supplemented only by an instrument in writing executed by the parties against whom enforcement is sought.

§ 26. REMEDIES. The remedies provided in this Agreement with respect to a breach by Seller, shall be cumulative and shall not in any way abridge, modify, or preclude any other right or remedies to which Buyer is entitled, either in law or in equity, including without limitation the right to enforce Seller's specific performance of this Agreement.

## CONCLUSIONS OF LAW

For reasons stated below, the Court finds that the Agreement is an enforceable one, but that specific performance will not be ordered because the Agreement provided for alternative performance such that Kenney's legal responsibility for failure to conclude the sale is limited to $100,000. Finally, the Court finds no estoppel against Kenney which would change this result.

In support of his assertion that the Agreement is unenforceable because the element of mutuality of obligation is lacking, Kenney maintains that Plaza's continuing attempts to find substitute or backup buyers for the Premises and the inclusion of the phrase "unless a better offer is received" in Plaza's Motion for Authority to Sell to Kenney are indicative of Plaza's belief that it was not, and did not intend to be, bound by the terms of the Agreement. Kenney sees enhancement of his position in the provision of Section 12(i) of the Agreement which subjects Plaza's authority to enter into the Agreement to the Bankruptcy Court's approval.

The Court finds that once the inspection contingency in Section 11(a) of the Agreement had been waived, Kenney lost his right to withdraw from the sale process without legal consequences. Plaza's continuing activities in searching for another Buyer as a backup or a higher bidder do not rise to the level of a breach such that Kenney was excused from performance.

Whether that result would have differed if Plaza had found another Buyer and had agreed to go forward while Kenney was still progressing to a closing is not before the Court at this time. Despite the current wishes of both parties, such an event did not occur.

■ Upon Kenney's waiver of the inspection contingency, the Agreement became binding on both parties as a matured contract. The Agreement's indication of a requirement for approval by the Bankruptcy Court does not change that result. Disapproval by the Court might well have been a fact which excused the performance by either party, but short of such disapproval, conditioning the seller's authority upon action by the Court did not change the binding nature of the Agreement between the parties pending Court approval. *Provider's Benefit Life Insurance Company v. Tidewater Group, Inc. (In Re Tidewater Group, Inc.)* 8 B.R. 930 (Bankr.N.D. Ga.1981). Indeed, given the explicit language of Section 363(b) of the Bankruptcy Code, once objections to any such sale had been resolved, Court approval may have been in the nature of a comfort order rather than a legal prerequisite.

■ Having determined that the Agreement is an enforceable and binding contract, the issue remaining is the effect upon Plaza's rights of the language used in Sections 3(b) and 26 of the Agreement once Kenney decided not to purchase the Premises. Specifically, did the parties intend to provide for optional performance by Kenney such that either he must purchase the Premises or forfeit his $100,000? Or was the intent merely to provide security for Kenney's closing of the sale or to estimate damages in the event he breached that duty? That intention determines if Kenney's failure to close the deal was merely the exercise of a bargained-for right or a breach which brings into play legal analysis of a liquidated damages clause. If the clause is one for liquidated damages, which does not necessarily foreclose specific performance, the Court must then examine the validity of the clause under principles applicable to such provisions.

The Court finds that the clause in Section 3(b) of the Agreement, read in conjunction with the retention of claims and rights against Plaza in Section 3(c) and the omission of any remedies for Plaza in Section 26, clearly provides that Kenney was granted a right of alternative performance. He could close the sale or he could limit his liability by forfeiture of his $100,000 deposit.

Although greater clarity in the specific phrasing of Section 3(b) would have been helpful, the phrase is more than merely a liquidated damages provision. The provision provides for a valid alternative performance. Such a provision also precludes the equitable decree of specific performance. *Coney v. Commercial National Reality Company,* 88 Ill.App.3d 1026, 44 Ill. Dec. 89, 410 N.E.2d 1181 (1980); *Landers v. Miller,* 27 Ohio Law Reporter 170 (C.P., Hamilton Cty., 1928). The reason for that conclusion, in this Court's opinion, is that if the alternative performance is bargained for, then the exercise of that bargained-for right is not, as a matter of fact, a breach. Without a breach, specific performance is inappropriate.

■ The Court finds further that the "rights and claims" fully settled by Kenney by forfeiture of his $100,000 deposit, according to the language in § 3(b) of the Agreement, in their common sense and legal meaning, include any and all equitable remedies. Support for this definition of "rights and claims" as including remedies can be found in *Black's Law Dictionary,* § 1-201(36) of the Uniform Commercial Code and § 101(4) of the Bankruptcy Code. Such an expression is more than a liquidated damages provision and acts as an expressed waiver of the right to seek specific performance of this Agreement.

In addition to the Court's determination that Section 3(b) and (c) and § 26, by their terms, clearly establish a bargained-for alternative performance, extrinsic evidence introduced by the parties and their agents may be considered if the words of the Agreement are not clear and unambiguous or are capable of differing interpretations. *Flannery v. Conyers,* 69 Ohio App. 546, 44

N.E.2d 470 (1942). Such evidence may be used to establish the understanding of the parties as to the questioned terms at the time the contract as executed. *Yoder v. Columbus and Southern Ohio Electric Company,* 39 Ohio App.2d 113, 316 N.E.2d 477 (1974). Such evidence is not admissible to contradict the terms of the Agreement, however, but to indicate what the parties understood their arrangement to be.

After hearing the testimony of the parties and Roberts, the Court finds that both parties understood that Kenney had a way out at a cost to him of $100,000, with such amount to be deposited and held in escrow pending closing. That finding is buttressed by the following testimony.

Mr. Tsao, the former president of Plaza, indicated that he understood Kenney could walk away with no obligation prior to June 15, 1987 and that Kenney's $100,000 was at risk once the inspection contingency was waived.

Roberts, who had some relationship to his business associate and sometime client Kenney, but who had been Plaza's broker-agent in the two previous attempts to sell the Premises, and who was being paid by Plaza to effectuate this deal, had some agency responsibility to Plaza. After June 15, 1987, Kenney told Roberts not to spend his commission because there as much left to do before it would be certain that the sale would close.

Kenney also indicated that he specifically ascertained that Roberts understood that Kenney's waiver of Section 11(a) of the inspection contingency did not act as a waiver of his protections under Section 3(b) and that Roberts was to reinforce that with Tsao. Roberts may not have passed that on to Plaza, as he should have, but that failure cannot be attributed to Kenney, who believed Roberts was acting as Plaza's agent in this matter.

At the time Kenney's attorney Davis communicated to Plaza's attorney Schlachet, that Kenney was withdrawing from the purchase, Davis also communicated a new offer of $50,000 from Kenney to Plaza for a 30–day extension of the closing date to attempt to work out an alternative business venture to purchase the Premises. Such an offer would be consistent with an interpretation of alternative performance in the nature of an option.

Other testimony indicated that Kenney had rejected an earlier form of the Agreement which had specifically reserved all rights, claims and remedies of Plaza against Kenney. Kenney made it clear from the beginning that his ability to limit his liability, if he decided not to close the sale, was a crucial and critical term of any deal.

Tsao's notes on the back of the first draft of the Agreement, which contains the same language in Sections 3(b) and 26 as does the final version, indicated that he saw this provision as an option for Kenney, at least as first proposed.

In summary, the Court finds that the evidence clearly indicates that Kenney had the alternative of closing the sale and paying the purchase price or forfeiting his $100,000. The phrase in Section 3(b), taken as a whole and construed with the omission of any remedies for Plaza in Section 26, considered with or without the extrinsic evidence, is intended to foreclose any action against Kenney, other than retention of the deposit by Plaza, if Kenney chose not to close the sale. This interpretation effectively establishes an alternative performance option for Kenney and means that his failure to close is but a bargained-for right. Even though the Agreement might have been more carefully drafted, the Court finds that the words themselves are sufficient to evidence the understanding of the parties.

The Court believes that Plaza knew what deal it was making. Although it may have hoped that Kenney's draft of Section 3(b) could be defeated if tested, Plaza knew at the time it entered into the Agreement what the arrangement was. The terms were not particularly advantageous for Plaza and put Plaza in an almost untenable bind. But Plaza undoubtedly felt it had little choice and needed any deal with an acceptable price term if it was to have any hope of working out of its financial problems and reorganizing for the benefit of its

creditors. That its hard deal did not include provision for "home free" time during the close-down phase, and that the sale was not consummated cannot be laid fully at Mr. Kenney's feet.

The Court, wish as it may, cannot make Kenney the savior of this debtor. Although this Court has many and extensive powers to vary contractual terms to facilitate the reorganization process, and may approve or disapprove contracts with third parties for concerns relevant to the estate, that power does not extend to remaking or altering the terms of arms-length post-petition contracts entered into by a debtor-in-possession operating its own business under the protection of this Court.

 Having found that the Agreement is an enforceable contract which provided, as an exclusive alternative performance, for the forfeiture of Kenney's $100,000 deposit, the Court finally must consider Plaza's argument that equitable estoppel nevertheless prevents Kenney from opposing specific performance.

Establishment of equitable estoppel in Ohio requires a representation by words, acts or silence, which communicates a fact or state of affairs in a misleading way, and which induces actual reasonable good faith reliance by the other party. *First Federal Savings and Loan v. Perry's Landings, Inc.*, 11 Ohio App.3d 135, 463 N.E.2d 636 (1983). The theory, however, appropriately only is used as a shield to limit otherwise unavoidable losses, and may not be available as a sword. *First Federal*, 11 Ohio App.3d at 144, 436 N.E.2d 636.

The Court finds that no communication occurred in this matter which could be taken as a representation within the meaning of estoppel. Kenney proceeded toward closing in good faith and communicated his change of mind soon after the economic facts became known to him. If his silence or acts were taken as representation by Plaza, such inferences and reliance were not reasonable under the terms of the Agreement, given Kenney's failure to waive the protections of Section 3(b) and the Agreement's requirements for closing the business of the hotel.

It is apparent to the Court that whatever misunderstandings occurred in his matter were intensified by the fact that the parties themselves communicated very little with each other, but rather spoke through their various agents. Indeed an explicit representation from Kenney might have delayed greatly Plaza's actions and, thereby, decreased its damages. No evidence of misrepresentation sufficient to establish an estoppel defense has been shown, however.

Consistent with the foregoing, judgment will be granted and entered in favor of Kenney as requested by Count Two of his complaint in adversary 2–87–0216. Judgment will be granted in favor of Plaza on Count One of Kenney's complaint in adversary 2–87–0216. Judgment will be granted in favor of Kenney on Plaza's complaint seeking specific performance in adversary 2–87–0217. Plaza's counterclaim asserted in response to Kenney's complaint in adversary 2–87–0217 is, hereby, rendered moot.

IT IS SO ORDERED.