[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Siltstone Resources, L.L.C. v. Ohio Pub. Works Comm.*, Slip Opinion No. 2022-Ohio-483.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2022-OHIO-483

SILTSTONE RESOURCES, L.L.C., ET AL., APPELLANTS, *v*. OHIO PUBLIC WORKS COMMISSION, APPELLEE, ET AL.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Siltstone Resources, L.L.C. v. Ohio Pub. Works Comm.*, Slip Opinion No. 2022-Ohio-483.]**

*Property law—Conveyance of oil and gas interests—Ohio Public Works Commission and Clean Ohio conservation fund, R.C. 164.20 et seq.—Deed restrictions on use and transfer—Remedies available at law and in equity—Court of appeals' judgment affirmed.*

(No. 2020-0031—Submitted January 26, 2021—Decided February 23, 2022.)

APPEAL from the Court of Appeals for Belmont County,

No. 18 BE 0042, 2019-Ohio-4916.

_____

**BRUNNER, J., announcing the judgment of the court.**

{¶ 1} Appellants, Siltstone Resources, L.L.C. ("Siltstone"), American Energy-Utica Minerals, L.L.C. ("Utica"), and Eagle Creek Farm Properties, Inc.

("Eagle Creek"), appeal a decision of the Seventh District Court of Appeals. 2019-Ohio-4916, 137 N.E.3d 144, ¶ 46, 54, 73 (7th Dist.). The court of appeals reversed a decision of the Belmont County Court of Common Pleas and held that amicus curiae Guernsey County Community Development Corporation ("CDC") had violated land-transfer restrictions that were included in a deed under the terms of CDC's grant agreement with appellee, Ohio Public Works Commission ("OPWC"). *Id.*; *see* Belmont C.P. No. 17 CV 128, 2018 WL 11188473 (July 20, 2018). The appellate court also found that OPWC was entitled to seek remedies in equity to conserve the land at issue. 2019-Ohio-4916 at ¶ 70-73.

**{¶ 2}** This court accepted jurisdiction and heard the parties' arguments on appeal along with supporting arguments of amici curiae, CDC, Gulfport Energy Corporation ("Gulfport"), Axebridge Energy, L.L.C., and Whispering Pines, L.L.C. Because we find that the restriction on transferability in the deed is valid, being reasonable and serving a charitable or public purpose, CDC's transfer of mineral interests to appellants as successors in interest was a violation of the deed restrictions. Accordingly, the state is entitled to relief as contemplated in the agreement between OPWC and CDC and we affirm the judgment of the Seventh District Court of Appeals.

## I. Facts and Procedural History

**{¶ 3}** In 2000, Ohio voters approved a constitutional amendment giving local communities a means to conserve and revitalize natural areas, open spaces, and lands devoted to agriculture. *See* Ohio Constitution, Article VIII, Section 2o. This new provision of the state constitution created a tax-exempt bond fund for making grants to political subdivisions and nonprofit organizations to revitalize and preserve natural spaces. Ohio voters adopted the following constitutional language describing the types of purposes the new bond fund would support:

2

(1) Conservation purposes, meaning conservation and preservation of natural areas, open spaces, and farmlands and other lands devoted to agriculture, including by acquiring land or interests therein; provision of state and local park and recreation facilities, and other actions that permit and enhance the availability, public use, and enjoyment of natural areas and open spaces in Ohio; and land, forest, water, and other natural resource management projects;

(2) Revitalization purposes, meaning providing for and enabling the environmentally safe and productive development and use or reuse of publicly and privately owned lands, including those within urban areas, by the remediation or clean up, or planning and assessment for remediation or clean up, of contamination, or addressing, by clearance, land acquisition or assembly, infrastructure, or otherwise, that or other property conditions or circumstances that may be deleterious to the public health and safety and the environment and water and other natural resources, or that preclude or inhibit environmentally sound or economic use or reuse of the property.

Ohio Constitution, Article VIII, Section 2o(A).

{¶ 4} Following voter approval of the constitutional amendment, the Ohio General Assembly adopted legislation to implement it, creating the Clean Ohio Conservation Fund, administered by OPWC. *See* R.C. 164.27(A). According to the legislation, OPWC's director is authorized to establish policies that encourage the "long-term ownership, or long-term control" of properties that are the subject of projects approved for funding through the Clean Ohio Conservation Fund. R.C. 164.26(A).

**{¶ 5}** In 2005, CDC, a nonprofit organization, applied for a Clean Ohio Conservation Fund grant. As part of its Leatherwood Creek Riparian Project grant application, CDC proposed to purchase a 228.485-acre property in Belmont County. CDC proposed to use the property to create a "green corridor" connecting several natural areas along Leatherwood Creek in Belmont and Guernsey counties.

**{¶ 6}** OPWC approved the project and in April 2006, the parties executed a 17-page grant agreement. The grant agreement described the project purpose, how CDC was to purchase the property, and the terms and conditions of funding through OPWC, including perpetual deed restrictions that were to be included in the recorded deed to the property. In 2007, CDC purchased the property and the deed was recorded in Belmont County.

**{¶ 7}** CDC's deed for the property included two essential restrictions. The first is a restriction on the use and development of the property, the "use restriction."

> 1. <u>Use and Development Restrictions</u>. Declarant [CDC] hereby agrees, for itself and its successors and assigns as owners of the Property, which Property shall be subject to the following: **This property will not be developed in any manner that conflicts with the use of the Premises as a green space park area that protects the historical significance of this particular parcel. Only current structures will be maintained and no new structures will be built on the Premises.**

(Boldface and underlining sic.)

**{¶ 8}** The second is a restriction requiring continued ownership and control, the "transfer restriction."

> 4. <u>Restriction on transfer of the Property</u>. Grantee acknowledges that the Grant is specific to Grantee and that OPWC's approval of Grantee's application for the Grant was made in reliance on Grantee's continued ownership and control of the Property. Accordingly, Grantee shall not voluntarily or involuntarily sell, assign, transfer, lease, exchange, convey or otherwise encumber the Property without the prior written consent of OPWC, which consent may be withheld in its sole and absolute discretion.

(Underlining sic.)

{¶ 9} Following the acquisition of the property by CDC, there were a number of assignments and transfers of the subsurface mineral rights involving different entities. In 2011, CDC entered into an oil and gas lease of the property with Patriot Land Company, L.L.C. ("Patriot") that provided CDC with a 14 percent royalty interest in the resulting production revenues. In 2012, Patriot assigned its lease to Gulfport, and in 2013, CDC sold 186.9189 acres of the subsurface mineral rights in the property to Siltstone for $3,884,180. Siltstone was thereafter entitled to collect the 14 percent royalty interest previously paid to CDC under the Patriot/Gulfport lease, the royalty interest having transferred to Siltstone as a result of its mineral-rights purchase from CDC.

{¶ 10} Even though it acquired the property with Clean Ohio grant funds and subject to the grant agreement, CDC did not inform or request permission from OPWC when it made its various transfers of the property's subsurface mineral rights. CDC held the opinion that a change in the use or ownership of the property's subsurface mineral rights did not affect the use of the property as a green space and therefore did not have an impact on or violate the deed restrictions that attached to the property as a result of CDC's grant agreement with OPWC. CDC also held the opinion that the property's subsurface mineral rights were severable from the

property's surface rights and that CDC also was free to transfer or lease those rights without violating the transfer restrictions in the property's deed.

{¶ 11} The parties do not contest that in 2015, assignee Gulfport suspended its mineral royalty payments apparently after concerns were raised that CDC may have been restricted by the deed from transferring the subsurface mineral rights. Thereafter, Siltstone filed suit in the Belmont County Court of Common Pleas for declaratory judgment and breach-of-contract claims against CDC and sought to quiet title to its ownership of the mineral rights in the subsurface of the property. Siltstone's original complaint named as defendants OPWC, CDC, and assignee Gulfport. OPWC counter- and cross-claimed, seeking an injunction against the subsurface mining activities and nullification of the subsurface leases and transfers as violating the deed restrictions required by the terms of the grant agreement between CDC and OPWC. Siltstone moved to dismiss OPWC's counter- and cross-claims. The trial court sustained that motion in part and thereby denied OPWC its requested injunction. The trial court concluded that "R.C. 164.26(A) bars OPWC from seeking injunctive or other non-monetary relief in this case." Belmont C.P. No. 17 CV 128, 2017 WL 11557569, *1 (Dec. 18, 2017).

{¶ 12} Later, dispositive motions were filed in the trial court, after additional oil and gas companies and interest-holders had been joined as parties to the litigation. OPWC moved for partial summary judgment, asking the court to declare as a matter of law that the use and transfer restrictions contained in the deed applied to both the surface and the subsurface of the property, integrated as one. Additional motions for summary judgment were filed by other parties. The trial court heard oral arguments on the dispositive motions and issued a decision denying OPWC summary judgment on the legal issues relating to use and transfer and declaring valid the leases and transfers of the mineral rights of the property.

{¶ 13} OPWC appealed the trial court's judgment that the deed restrictions did not apply to the subsurface of the property and the earlier holding of the trial

6

court denying OPWC's prayer for an injunction. The Seventh District reversed; it reasoned that the use restriction applies to disturbances of only the surface of the property but that the transfer restriction applies to both the surface and subsurface rights of the property. 2019-Ohio-4916, 137 N.E.3d 144, at ¶ 46, 54. The Seventh District held that CDC violated the transfer restrictions, and it further held that OPWC had the authority to seek equitable remedies. *Id*. at ¶ 54, 71.

**{¶ 14}** We affirm.

## II. Analysis

### A. *Enforceability of the Use Restriction*

**{¶ 15}** Appellants, amicus curiae CDC, and other amici have abandoned the argument that the enforceability of deed restrictions on use is dependent on whether the use is of the property's surface or subsurface. Appellants argued to the court of appeals that the surface of the property has not been disturbed or affected by wells that were accessed laterally, with no surface structures having been built on the surface of the property, and with no water or soil displacement or contamination having occurred on the surface of the property. Appellants argued to the court of appeals that this supports the factual finding by the trial court that no violation of the use restriction had occurred as a result of the subsurface activity. The appellate court agreed. *Id.* at ¶ 46. Accordingly, no party to this appeal seeks reversal of that holding. However, because this court reviews legal issues de novo, we are not constrained to accept the appellate court's legal analysis of whether CDC and other interest holders violated the deed's use restriction. *Nationwide Mut. Fire Ins. Co. v. Guman Bros. Farm*, 73 Ohio St.3d 107, 108, 652 N.E.2d 684 (1995) ("Unlike determinations of fact which are given great deference, questions of law are reviewed by a court *de novo*").

**{¶ 16}** The appellate court held that the terms "property" and "premises" in the property's deed have the same meaning and that the deed conveyed both the surface and subsurface of the property. 2019-Ohio-4916, 137 N.E.3d 144, at ¶ 37.

The appellate court limited the terms "property" and "premises" to apply to only the surface when used in conjunction with the term "green space park area." *Id.* at ¶ 37, 43. The appellate court held that the language in the deed, "This property will not be developed in any manner that conflicts with the use of the Premises as a green space park area," applied only to the surface of the land and not to the subsurface, *id.* at ¶ 41, while apparently taking notice that subsurface mining generally includes some surface activities, *see id.* at ¶ 44. Because the trial court dismissed OPWC's action short of a trial after denying OPWC summary judgment on legal issues, this fact was not actually established nor subject to judicial notice.

{¶ 17} Facts subject to judicial notice are "not subject to reasonable dispute" and are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Evid.R. 201(B); *Wiseman v. Cambria Prods. Co.*, 61 Ohio App.3d 294, 300, 572 N.E.2d 759 (4th Dist.1989). There is not enough evidence in the record to support the appellate court taking judicial notice that subsurface mining generally includes some surface activities. It cannot be discerned from the record stipulations made before the trial court what the subsurface use entailed or how it affected the property's surface and green-space use.

{¶ 18} In fact, our recent caselaw eliminates the need for taking judicial notice such as the appellate court did:

> In describing the property interest created by an oil and gas lease, we have acknowledged that the lease affects the possession and custody of both the mineral and surface estates. [*Chesapeake Exploration, L.L.C. v. Buell*, 144 Ohio St.3d 490, 2015-Ohio-4551, 45 N.E.3d 185,] ¶ 60. During the term of the lease, "the lessor effectively relinquishes his or her ownership interest in the oil and gas underlying the property in favor of the lessee's exclusive right

to those resources." *Id.* at ¶ 62. The lessee also enjoys reasonable use of the surface estate to accomplish the purposes of the lease. *Id.* at ¶ 60.

*Browne v. Artex Oil Co.*, 158 Ohio St.3d 398, 2019-Ohio-4809, 144 N.E.3d 378, ¶ 23.

{¶ 19} The appellate court in this case found that it was conceivable that subsurface activities might affect the property's intended use as a green space. One day after the court of appeals' decision was issued, this court decided *Browne*, in which we acknowledged that an oil and gas lease affects both the mineral and surface estates. *Id.* Further, the appellate court's holding that the use restriction in the property's deed did not apply to the subsurface of the property, in the absence of trial-court factual findings about the impact that leasing the mineral rights had on green-space use, was not an application of law based on facts.

{¶ 20} *Browne* negates a bifurcated analysis of the property's use separating surface from subsurface and thereby necessitates an integrated analysis of the use of the deeded land. For the purpose of determining whether the use of the property as a green-space park area, as CDC and OPWC intended and agreed, was violated by the lease of the subsurface mineral rights, the trial and appellate courts should have examined whether *any* use of the property other than as a green space park area would be acceptable under the terms of the deed restriction.

{¶ 21} To be clear, in the absence of trial-court findings about the impact that the subsequent leases, assignments, and purchases of subsurface mineral rights had on the use of the property as a green space, this opinion declines to adopt any generalized finding that a use restriction such as this one applies or does not apply to subsurface activities. This opinion also declines to find that legal analyses of use and transfer restrictions must always be done separately.

*B. Enforceability of the Transfer Restriction*

{¶ 22} In general, deed restrictions or agreements that impose restrictions on real property may impede a property's transferability. *See First Fed. S. & L. Assn. of Toledo v. Perry's Landing, Inc.*, 11 Ohio App.3d 135, 141-42, 463 N.E.2d 636 (6th Dist.1983) (analyzing a clause in a mortgage agreement). We also recognize that some use restrictions may by their nature limit marketability and inherently affect future transfers. Were this court to require or establish separate analyses for use and transfer restrictions, we may in some situations create distinctions without a difference and in others, impose conflicting results when applied to both in the same or related transactions. Again, when analyzing the appellate decision in this case, the question to be decided is simply whether a transfer or agreement effecting or affecting a transfer of interest in the property conflicts with the property's agreed use and operation as a green-space park area. *See* Ohio Const. Article VIII, Section 2o; R.C. 164.22. And while the caselaw contains threads specific to the nuances of differing types of restrictions, we find that the property-law principles over time are sufficiently woven to create a sturdy fabric that at this time needs no additional support, repair, or bolstering from new theories or tests molded from the facts of this particular situation.

{¶ 23} Appellants argue that for a restriction on transfer to be enforceable as to any part of the property, or even at all, the legislature must create and authorize "such restraint on alienation in a statute by express terms or unmistakable implication." Appellants seek legal clarity on this issue, urging that transfer restrictions and essentially all deed restrictions on transferability are inherently void as against public policy, unless they are specifically legislated. Restraints on the use and transferability of real property are subject to significant scrutiny as they may violate public policy encouraging the free use, enjoyment, and transfer of real property. Yet, this court has time and again recognized and respected the fundamental rights of parties to contract freely with the expectation that the terms

of their agreement will be enforced. *See Wildcat Drilling, L.L.C. v. Discovery Oil & Gas, L.L.C.*, 164 Ohio St.3d 480, 2020-Ohio-6821, 173 N.E.3d 1156, ¶ 16.

{¶ 24} In balancing these important and sometimes competing public-policy interests, legal jurisprudence has generally threaded the needle toward keeping the agreement of the parties stitched together when deed restrictions are unambiguous and reasonable and has required that both the terms of a restrictive covenant and the intent of the parties in rendering the covenant as clearly expressed in its restrictive language be upheld. *See Cleveland Baptist Assn. v. Scovil*, 107 Ohio St. 67, 72, 140 N.E. 647 (1923); *DeRosa v. Parker*, 197 Ohio App.3d 332, 2011-Ohio-6024, 967 N.E.2d 767, ¶ 9-10, 12 (7th Dist.); *Head v. Evans*, 1st Dist. Hamilton No. C-790831, 1981 WL 9628, *3 (Feb. 11, 1981).

{¶ 25} Courts have often also evaluated the purpose and the duration of a restriction with a view toward its reasonableness and whether it violates public policy, finding that indefinite and absolute restraints on transferability are void when there is no linkage between the purpose of the restraint and an indefinite duration. *See Raisch v. Schuster*, 47 Ohio App.2d 98, 101, 352 N.E.2d 657 (1st Dist.1975). In probate law, a testator's devise of real property that contains restrictions on its future sale has been held void. *See Anderson v. Cary*, 36 Ohio St. 506 (1881). Cases cited by appellants and amici attempt to limit dead-hand control of property and are distinguishable from cases in which the restrictions are for some designated purpose or by agreement, including when the testamentary transfer of real property is charitable in nature. *See, e.g.*, *Bragdon v. Carter,* 4th Dist. Scioto No. 17CA3791, 2017-Ohio-8257, ¶ 2, 11-12, 14 (adhering to *Anderson* and finding that a restriction on sale of property so " 'that [the testator's] children and their heirs shall always have a place to live' " was void). *But see First Fed. S. & L.*, 11 Ohio App.3d at 141-142, 463 N.E.2d 636 (noting the tension between freedom of alienation and freedom of contract but holding that no restraint on alienation existed); *Ohio Soc. for Crippled Children & Adults, Inc. v. McElroy*, 175

Ohio St. 49, 52-53, 191 N.E.2d 543 (1963) (upholding testator's devise of his property to a charitable organization for a charitable purpose with the condition that said property was " 'not to be sold or leased' " by the charitable organization).

{¶ 26} We hold that these principles governing restraints on real property, and any exceptions to those principles, are workable, valid, and enforceable here. CDC contracted with OPWC for quasi-public funding to acquire the property for the Leatherwood Creek Riparian Project. CDC accepted the grant and executed the deed as it had agreed with OPWC in the grant agreement with full knowledge of OPWC's terms and restrictions. There is no ambiguity in the documents about either the terms of the restrictions or the parties' intent in agreeing to them. Moreover, the grant documents, including the application and project description, all public records, provide further explanation of the purpose of and need for the agreed restrictions. It is clear that OPWC and CDC contracted for clearly stated restraints on real-property use and transfer, which are reasonable in light of the project purpose. *See Raisch* at 101.

{¶ 27} And while the duration of the deed restrictions is indefinite, the restraints are not absolute. The indefinite duration recognizes the public purpose of land conservation and preservation. Yet, the transfer clause is not so restrictive; transfers can occur with OPWC permission. The "Perpetual Restrictions" clause in the deed implies that modifications of the project are possible with the consent of OPWC:

> 2. Perpetual Restrictions. The restrictions set forth in this deed shall be perpetual and shall run with the land for the benefit of, and shall be enforceable by, Ohio Public Works Commission (OPWC). This deed and the covenants and restrictions set forth herein shall not be amended, released, extinguished or otherwise

12

> modified without the prior written consent of OPWC, which consent
> may be withheld in its sole and absolute discretion.

(Underlining sic.)

{¶ 28} Thus, by the terms of the deed, CDC may seek permission from OPWC to transfer or lease the green-space property, and CDC could presumably request to modify the project in the event of a conflict with the use of the property as a green-space area.

{¶ 29} Moreover, because this particular transfer of property involves the transfer of land for a charitable or public purpose, the conventional rules against restraints are subject to exceptions. This court has held that there are distinct exceptions to the rule against restraints on alienation in cases of charitable or public purposes. *See Ohio Soc. for Crippled Children & Adults*, 175 Ohio St. at 52-54, 191 N.E.2d 543. In *Ohio Soc. for Crippled Children & Adults*, we reaffirmed that " 'charities form an exceptional class in reference to the rule against restraints of alienation,' " because " 'a normal characteristic of property devoted to charitable purposes [is] that it is inalienable.' " *Id.* at 53, quoting *Dickenson v. Anna*, 310 Ill. 222, 230-231, 141 N.E. 754 (1923). And generally, transfer of property for conservation purposes requires or involves perpetuity. *See* 26 U.S.C. 170(h) (requiring that a "conservation purpose [be] protected in perpetuity" in order to qualify as a "qualified conservation contribution" of land under the Internal Revenue Code); *see also* R.C. 5301.85 and 5301.89(A) (specifying that an environmental covenant runs with the land and is perpetual unless subject to an exception).

{¶ 30} Thus, in applying caselaw that has addressed a variety of situations over time, we find that it is appropriate to recognize the state's interest in encouraging charitable giving and in instilling confidence in charitable grantors that

their purpose for giving will be observed and preserved with integrity over time. *Gearhart v. Richardson*, 109 Ohio St. 418, 431-432, 434-435, 142 N.E. 890 (1924).

{¶ 31} Appellants argue that R.C. 164.26, which authorizes OPWC to administer the Clean Ohio grant program, does not specifically or impliedly confer the authority to restrict alienability of property. Appellants meld a variety of cases involving zoning ordinances, statutes of a penal nature, and other state-sanctioned restrictions on use or transfer of land to support their theory. Appellants also cite the holding in *Hamilton v. Link-Hellmuth, Inc.*, that "any such statutory restriction [on alienation] must be specifically stated and not implied." 104 Ohio App. 1, 8, 146 N.E.2d 615 (2d Dist.1957). The Second District noted in that case that if the statute in question were found to be ambiguous (which it was not), they would have been obligated to construe any doubt in favor of alienability. *Id.*

{¶ 32} Neither *Hamilton* nor any of the other cases cited by appellants apply here. R.C. 164.26 is not a zoning ordinance or a statute of penal nature; it does not create or impede any rights with respect to property owners. R.C. 164.26 is an authorizing statute that instructs OPWC to create policies consistent with administering the grant program envisioned by voters when they adopted the program by amending the state's constitution. The restrictions in the deed before us are the mechanism to ensure that the Leatherwood Creek Riparian Project reaches fruition and fulfills its purpose. Nothing was unilaterally imposed upon CDC, and if CDC did not wish to abide by the terms of the grant and thereby the deed restrictions for the property purchased with grant funding, it could have sought funding for this project elsewhere.

{¶ 33} Amici Gulfport, Axebridge Energy, and Whispering Pines urge us to find that the deed restrictions violate public policy in so far as they impede oil and gas development, citing this court's opinion in *Newbury Twp. Bd. of Trustees v. Lomak Petroleum*, 62 Ohio St.3d 387, 583 N.E.2d 302 (1992). In *Newbury*, we recognized that it is the public policy of Ohio to encourage oil and gas production

in a manner consistent with the health, safety, and welfare of the citizens of Ohio. *Id.* at 389. We applied that public policy in the context of reviewing a local zoning ordinance regulating oil and gas exploration, holding the ordinance to be preempted by former R.C. 1509.39. *Id.* at 389-392. The issue of preemption is not before us, and as we noted, the authorizing statute in question, R.C. 164.26, is not a zoning ordinance and does not create or impede any particular rights in property owners.

{¶ 34} There is, therefore, no need to establish a new test to determine the enforceability of the deed restrictions on transfer in cases such as this. We cannot say, as the dissent would seem to have it, that the law requires that all restraints on alienation are invalid. The general rule may favor alienability, but no rule, statute, or other authority supports a complete ban on transfer restrictions. 61 American Jurisprudence 2d, Perpetuities and Restraints on Alienation, Sections 90-91 (2021). The transfer restriction in this case is sufficiently supported by the public-policy purpose authorized by the Ohio Constitution in Article VIII, Section 3, and moreover, was contracted for by the parties for that specific public purpose.

{¶ 35} It has been said, especially regarding questions involving environmental law, that judges

> can bring integrity and certainty to the process of environmental protection, and help to ensure environmental responsibility and accountability within the government and the private sector. * * *
> * * *
> * * * The voice of the judge should represent reason, impartiality, and understanding of all the interests at stake. A judge's serious response to a given case helps to shape and reinforce a society's view of the seriousness of the problem represented by that case.

Christopher G. Weeramantry, *Judicial Handbook on Environmental Law*, Introduction XXI (United Nations Environment Programme) (June 30, 2004), available at www.elaw.org/content/unep-judicial-handbook-environmental-law (accessed Dec. 1, 2021) [https://perma.cc/NB6N-YJGT]. Because the transfer restriction here applied to the entire property and is enforceable as a valid restraint on alienability, we hold that CDC violated the restriction when it leased and transferred the mineral rights.

### *C. Remedies*

{¶ 36} Long-term ownership and control of property acquired with grant funds is a central objective of the Clean Ohio program, as established by the language of R.C. 164.26:

> (A) The director of the Ohio public works commission shall establish policies related to the need for long-term ownership, or long-term control through a lease or the purchase of an easement, of real property that is the subject of an application for a grant under sections 164.20 to 164.27 of the Revised Code and establish requirements for documentation to be submitted by grant applicants that is necessary for the proper administration of this division.

{¶ 37} The transfer restriction written into the CDC deed is consistent with R.C. 164.26.

> 4. Restriction on transfer of the Property. Grantee acknowledges that the Grant is specific to Grantee and that OPWC's approval of Grantee's application for the Grant was made in reliance on Grantee's continued ownership and control of the Property. Accordingly, Grantee shall not voluntarily or involuntarily sell, assign, transfer, lease, exchange, convey or

16

> otherwise encumber the Property without the prior written consent of OPWC, which consent may be withheld in its sole and absolute discretion.

(Underlining sic.)

{¶ 38} Moreover, the very definitions of the words used in the constitutional amendment, "conservation" and "preservation"—which are synonyms—express endeavors that imply restraint. "Conservation" is defined as "planned management of a natural resource to prevent exploitation, destruction, or neglect." *Merriam-Webster's Collegiate Dictionary* 265 (11th Ed.2020). "Preservation" is the noun form of the word "preserve," which means "to keep safe from injury, harm, or destruction." *Id.* at 982.

{¶ 39} Moreover, in construing constitutional text ratified by direct vote, we must " 'ascertain and give effect to' " the intent of the voters. *Centerville v. Knab*, 162 Ohio St.3d 623, 2020-Ohio-5219, 166 N.E.3d 1167, ¶ 22, quoting *State ex rel. Sylvania Home Tel. Co. v. Richards*, 94 Ohio St. 287, 294, 114 N.E. 263 (1916). In doing so, we may look to the purpose of the amendment and the history of its adoption "in determining the meaning of the language used." *Id.* The language of R.C. 164.26 is inextricably connected to the constitutional text that was ratified by direct vote, and we must therefore "consider how the [enabling] language would have been understood by the voters who adopted the amendment." *Centerville* at ¶ 22, citing *Castleberry v. Evatt*, 147 Ohio St. 30, 33, 67 N.E.2d 861 (1946).

{¶ 40} It is unlikely that voters approved the constitutional amendment creating the program intending that a grant recipient could stray from the project purpose of conservation or preservation, develop or use the acquired property in a manner inconsistent with the project purpose, or simply relinquish control of the project property. If that were the case, the Clean Ohio fund would be reduced to nothing more than a financing program not tied to conservation or preservation at

all—and not what the people of Ohio intended when they voted for it. In situations in which the language of a constitutional amendment is unclear or doubtful in meaning, the court may "review the history of the amendment and the circumstances surrounding its adoption, the reason and necessity of the amendment, the goal the amendment seeks to achieve, and the remedy it seeks to provide." *Centerville* at ¶ 22. Here, while there does not appear to be a question of ambiguity, we discern that the voters of Ohio by their ratified constitutional amendment created a tool for local communities to acquire and set aside lands for the specific purpose of conservation.

{¶ 41} While we do not categorically say that Clean Ohio Conservation Fund properties are inherently incompatible with mineral extraction, we recognize that OPWC is tasked with ensuring that lands acquired with Clean Ohio funds are preserved and revitalized—that they are protected from injury, harm, or destruction. *See* R.C. 164.22; *Merriam-Webster's* at 982. When CDC began using and developing the property acquired for the Leatherwood Creek Riparian Project in a manner that OPWC perceived as inconsistent with the project and contrary to long-term ownership and control, OPWC sought to protect the land as a green space. OPWC asked the trial court for injunctive relief. It sought to halt mining activities by unanticipated third parties, to void CDC's transactions with the oil and gas companies, to restore full ownership of the property to CDC, and to require CDC to comply with the terms of the agreement.

{¶ 42} We do not interpret the state constitutional provision underpinning R.C. 164.26 as limiting OPWC to liquidated damages, as the trial court found and as argued by appellants. Instead, a plain reading of the statute shows that R.C. 164.26(A) requires OPWC to maintain program policies that "provide for proper liquidated damages *and* grant repayment for entities that fail to comply with the long-term ownership or control requirements established under this division." (Emphasis added.) Appellants argue that some sort of monetary relief is the only

18

remedy given to OPWC in seeking relief and that an injunction is therefore not an available remedy. OPWC counters that nothing in R.C. 164.26 limits its remedies exclusively to liquidated damages and that to do so would run counter to the purpose of the Clean Ohio Fund program, essentially allowing disingenuous recipients to "buy their way out" of long-term stewardship.

{¶ 43} We agree. Written into the deed restrictions is an "Enforcement" clause:

> 3. <u>Enforcement</u>. If Grantee, or its successors or assigns as owner of the Property, should fail to observe the covenants and restrictions set forth herein, the Grantee or its successors or assigns, as the case may be, shall pay to OPWC upon demand, as liquidated damages, an amount equal to the greater of (a) two hundred percent (200%) of the amount of the Grant received by Grantee, together with interest accruing at the rate of six percent (6%) per annum from the date of Grantee's receipt of the Grant, or (b) two hundred percent (200%) of the fair market value of the Property as of the date or demand by OPWC. Grantee acknowledges that such sum is not intended as, and shall not be deemed, a penalty, but is intended to compensate for damages suffered in the event a breach or violation of the covenants and restrictions set forth herein, the determination of which is not readily ascertainable.
>
> OPWC shall have the right to enforce by any proceedings at law or in equity, all restrictions, conditions and covenants set forth herein. Failure by OPWC to proceed with such enforcement shall in no event be deemed a waiver of the right to enforce at a later date the original violation or a subsequent violation.

(Underlining sic.) This clause provides that when a grantee fails to observe the restrictions in the deed, the grantee shall be obligated to pay liquidated damages. Specifically, liquidated damages are set at the greater of 200 percent of the amount of the grant plus interest or 200 percent of the fair market value of the property.[1] Yet, the enforcement clause also specifically provides that OPWC may enforce the deed restrictions "by any proceedings at law or in equity."

{¶ 44} Also, nothing in R.C. 164.26 prohibits OPWC from seeking equitable relief against a grantee alleged to have violated the grant agreement. Even though the General Assembly legislated that OPWC policies must include grant repayment and liquidated damages as a condition of breach, that requirement does not foreclose other remedies. Specifically, R.C. 164.26 refers to these damage requirements in cases in which grantees "fail to comply with the long-term ownership or control requirements" that are required in that section. But damages are not the only remedy available to OPWC under the Clean Ohio program under both the agreement between OPWC and CDC and in a public-policy analysis on the alienability of land.

{¶ 45} Long-term ownership and control is a predominant objective in the Clean Ohio program. The objectives of operating the program are based in conservation and preservation, entailing more than simply holding property and allowing others with no privity with the granting entity to use it on behalf of Ohioans. R.C. 164.22 specifically authorizes OPWC (and district natural-resources-assistance councils) to acquire open spaces and protect watersheds, including specifically through the "acquisition of easements." R.C. 164.22(A) and (B). In doing this, OPWC's director has the specific authority to

---

1. Siltstone and American Energy-Utica Minerals acknowledge that 200 percent of the fair market value of the property would likely be the applicable number here, since Siltstone paid $3,707,162.54 for approximately 6/7ths of the mineral rights to the property in 2013 and that number far exceeds 200 percent of the $430,200 grant amount.

(4) [a]dopt rules establishing the procedures for making applications, reviewing, approving, and rejecting projects for which assistance is authorized under [R.C. Chapter 164], and any other rules needed to implement the provisions of [R.C. Chapter 164].

* * *

* * *

[and] (9) [d]o all other acts, enter into contracts, and execute all instruments necessary or appropriate to carry out [R.C. Chapter 164].

R.C. 164.05(A).

{¶ 46} There is no indication that the General Assembly, in giving OPWC the foregoing authority—to acquire easements, enter into contracts, execute instruments, adopt necessary rules, and "[d]o all other acts"—intended for OPWC's exclusive remedy on behalf of Ohioans to be liquidated damages and grant repayment in all situations. The General Assembly apparently deemed these specific remedies important, but there is no express or implied language leading to the inference that the General Assembly intended to prohibit OPWC, as the agency responsible for executing the will of the voters, from availing itself on behalf of the people of longstanding, common-law remedies associated with contracts, easements, and executed instruments. *See Salem Iron Co. v. Hyland*, 74 Ohio St. 160, 77 N.E. 751 (1906) (discussing the purpose of courts of equity); *Brown v. Huber*, 80 Ohio St. 183, 88 N.E. 322 (1909) (granting enforcement of deed restrictions through injunctive relief); *Ciski v. Wentworth*, 122 Ohio St. 487, 172 N.E. 276 (1930) (affirming injunctive relief to protect an implied easement); *Sternberg v. Kent State Univ. Bd. of Trustees*, 37 Ohio St.2d 115, 308 N.E.2d 457 (1974) (noting that specific performance of contracts is an equitable remedy).

**{¶ 47}** We hold that the language and authority in R.C. 164.26 is clear and does not forbid OPWC from seeking remedies at law and in equity, as is provided for in the agreement between CDC and OPWC. Despite the efforts exerted by appellants in arguing the intent of the General Assembly and the extent of OPWC's authority, we find the statutory scheme implementing Article III, Section 2o of the Ohio Constitution to be unambiguous. " 'An unambiguous statute is to be applied, not interpreted.' " *State ex rel. Brown v. Dayton Malleable, Inc.*, 1 Ohio St.3d 151, 155, 438 N.E.2d 120, (1982), quoting *Sears v. Weimer*, 143 Ohio St. 312, 55 N.E.2d 413 (1944), paragraph five of the syllabus. Thus, there is no need to interpret what is clear in the statute.

### III. Conclusion

**{¶ 48}** For the reasons set forth above in Parts I, II.B., and II.C., the judgment of the court of appeals is affirmed.

Judgment affirmed.

O'CONNOR, C.J., and STEWART, J., concur.

DONNELLY, J., concurs, with an opinion.

DEWINE, J., dissents, with an opinion joined by KENNEDY and FISCHER, JJ.

————————————

**DONNELLY, J., concurring.**

**{¶ 49}** I concur in the majority's judgment, and I join the lead opinion as to its holdings that (1) the Guernsey County Community Development Corporation ("CDC") violated enforceable land-transfer restrictions that were included in a deed and thus violated the terms of CDC's grant agreement with appellee, Ohio Public Works Commission ("OPWC") and (2) OPWC was entitled to seek remedies at law and in equity to conserve the land for its intended purpose. I do not join Part II.A. of the lead opinion regarding the enforceability of the deed restrictions on the use of the property's surface or subsurface, because that issue was not raised by the parties and is not necessary to the decision in this case.

_____

**DEWINE, J., dissenting.**

{¶ 50} We need only answer a single question to resolve this appeal: is the Transfer Restriction contained in The Guernsey County Community Development Corporation's deed an invalid restraint on alienation? Under our established precedent, the answer is plainly yes. And under the so-called modern reasonableness test applied by other courts, the answer is also yes. Because the validity of the Transfer Restriction is the only matter in front of us, that should end this case.

{¶ 51} The lead opinion, though, goes off the rails. It first decides to take up a question that is not in front of us: whether there has been a violation of a separate deed restriction limiting the use of the land to green space. It finds a violation of this Use Restriction, despite the un-appealed court of appeals' decision to the contrary. Then, disregarding centuries of caselaw, the lead opinion decides that use restrictions and transfer restrictions should be judged under the same legal standards. Finally, it applies caselaw applicable to use restrictions to the Transfer Restriction, and largely through this misapplication of precedent, declares the Transfer Restriction valid.

{¶ 52} I would stick to established legal principles and decide the appeal that is in front of us. Because the Transfer Restriction is an unreasonable restraint on alienation, it is invalid. As a consequence, I would reinstate the judgment of the trial court.

**I. The issue before us: is the Transfer Restriction enforceable?**

{¶ 53} In 2006 the Development Corporation purchased approximately 200 acres of land ("the property") using grant money from the Ohio Public Works Commission. As part of the deal, the Development Corporation agreed to include two different types of restrictions in the deed.

{¶ 54} The deed's Use Restriction prohibits development of the property "in any manner that conflicts with the use of the Premises as a green space park area that protects the historical significance of [the property]." The Transfer Restriction provides that the Development Corporation "shall not voluntarily or involuntarily sell, assign, transfer, lease, exchange, convey or otherwise encumber the property without the prior written consent of the Commission, which consent may be withheld in its sole and absolute discretion." The provision recites that the grant of Clean Ohio funds is specific to the Development Corporation and was made in reliance on the Development Corporation's continued ownership of the property.

{¶ 55} In addition, the deed contains an enforcement provision that authorizes liquidated damages of double the grant amount for violation of the deed provisions. The enforcement provision further states that the Public Works Commission has the right to enforce the restrictions "by any proceedings at law or in equity."

{¶ 56} The Development Corporation subsequently transferred and leased its underground mineral rights to several parties without receiving the Public Works Commission's prior written consent. Some of these parties transferred or leased these subsurface rights to other parties. This state of affairs ultimately led to the instant litigation. One of the parties that received subsurface rights from the Development Corporation sought a declaratory judgment that there was no violation of the Use and Transfer Restrictions. The Public Works Commission filed a counterclaim, seeking a declaration that there was a violation of both restrictions. The Public Works Commission asked the court to declare all the transfers of the subsurface rights invalid and grant both injunctive relief and liquidated damages.

{¶ 57} The trial court found no basis to declare the transfers invalid. "Because green space is not underground" and because the Public Works Commission had not contended that there had been mining activities that disturbed

the surface, the trial court found that the Use Restriction had not been violated. The court determined that the Transfer Restriction constituted an unreasonable restraint on alienation and was therefore unenforceable. As a result, the court entered a final judgment that quieted title in favor of the parties with an interest in the subsurface mineral rights.[2]

{¶ 58} The court of appeals affirmed the trial court's judgment as to the Use Restriction, but it reversed as to the Transfer Restriction. It found that the Transfer Restriction was enforceable, that the Development Corporation had violated the Transfer Restriction by conveying the subsurface mineral rights, and that both equitable relief and damages were authorized by the deed. 2019-Ohio-4916, 137 N.E.3d 144 (7th Dist.), ¶ 46; *see id.* at ¶ 53-54, 71. The court of appeals remanded to the trial court "to determine the proper equitable relief and/or the amount of liquidated damages." *Id.* at ¶ 73.

{¶ 59} The subsurface-interest holders appealed to this court, contending that the court of appeals had erred in finding the Transfer Restriction enforceable and allowing for an award of equitable relief. The Public Works Commission did not file a cross-appeal, and thus has not challenged the judgments of the trial court and the court of appeals that there has been no violation of the Use Restriction.

## II. The Transfer Restriction is invalid

{¶ 60} The threshold question in this case is whether the Transfer Restriction is enforceable. And despite the impression one might get from the lead opinion, that question is easily answered. Under our existing caselaw, the Transfer Restriction is invalid because it is an absolute restraint on alienation of a fee-simple

---

2. Siltstone Resources, L.L.C., initiated the action and through cross-claims and counter-claims, a variety of other parties claiming an interest in the subsurface mineral rights were brought into the litigation. There are three appellants before us, Siltstone Resources, Eagle Creek Farm Properties, Inc., and American Energy-Utica Minerals, L.L.C.

estate. And even if we apply the so-called modern approach, the Transfer Restriction is invalid because it is unreasonable.

## A. Ohio has long followed the common-law rule prohibiting absolute restraints on alienation

{¶ 61} The Transfer Restriction prevents any transfer of the property without the consent of the Public Works Commission. The restriction is absolute. It is unlimited in time and scope. And it applies to and all future transferees. As a first-year law student could tell you, such restrictions have historically been considered invalid. *See* Dukeminier & Krier, *Property*, 379 (1981) ("An absolute * * * restraint upon a legal fee simple is almost always held void").

{¶ 62} The prohibition on restraints on alienation dates back to the days of King Edward I and the issuance of the statute Quia Emptores in 1290, stripping feudal lords of the power to block alienations by their tenants. *Id*. at 358, 378. At common law, absolute restraints on alienation of fee-simple lands were strictly prohibited as " 'repugnant to the fee.' " Joseph William Singer, *The Rule of Reason in Property Law*, 46 U.C.Davis L.Rev. 1369, 1410 (2013), quoting *Northwest Real Estate Co. v. Serio*, 156 Md. 229, 144 A. 245, 246 (1929). Because the power of alienation is an essential characteristic of an estate in fee simple, any attempt to restrain that power was considered void. Such restraints were considered economically destabilizing, preventing land from flowing freely in commerce and being put to its highest and best use. *See* Dukeminier & Krier at 192.

{¶ 63} Ohio, like most states, has long followed the common-law rule. *See Hobbs v. Smith*, 15 Ohio St. 419, 425-427 (1864); *Anderson v. Cary*, 36 Ohio St. 506 (1881), paragraph three of the syllabus. As we explained over a century ago, "it is of the very essence of an estate in fee simple absolute, that the owner * * * may alien[ate] it * * * at any and all times." *Anderson* at 515. Thus, "any attempt to evade or eliminate this element from a fee simple estate, either by deed or by will, must be declared void and of no force." *Id.*

**{¶ 64}** Not only has this rule long been around, it has also been consistently followed by Ohio courts. *E.g.*, *Bragdon v. Carter*, 4th Dist. Scioto No. 17CA3791, 2017-Ohio-8257, ¶ 11, quoting *Margolis v. Pagano*, 39 Ohio Misc.2d 1, 3, 528 N.E.2d 1331 (C.P.1986) (" 'The case law of Ohio holds that any attempt by a testator to restrain alienation on a grant of fee simple must be declared void' "); *Foureman v. Foureman*, 79 Ohio App. 351, 354, 70 N.E.2d 780 (2d Dist.1946); *Durbin v. Durbin*, 106 Ohio App. 155, 159, 153 N.E.2d 706 (3d Dist.1957); *Murdock v. Lord*, 14 Ohio N.P.(N.S.) 156, 31 Ohio Dec. 593, 602 (C.P.1913); *Neidler v. Donaldson*, 9 Ohio Misc. 208, 212-213, 224 N.E.2d 404 (P.C.1967). As one Ohio treatise puts it, "[s]ince an estate in fee simple implies the entire property in realty, the power of alienation is necessarily and inseparably incidental to it, and an unlimited, conditional restraint of alienation attached to such an estate is void." 41 Ohio Jurisprudence 3d, Estates, Powers, and Restraints on Alienation, Section 216 (2021). Ohio's rule is consistent with the traditional rule of other states. *E.g.*, *Serio*, 156 Md. at 233-234, 144 A. 245.

**{¶ 65}** " '[T]he rules against restraints on alienation are designed to prevent at least five social "evils": (a) obstruction of commerce and productivity; (b) concentration of wealth; (c) survival of the least fit; (d) abuse of creditors; and (e) dead hand control.' " *Neidler* at 212, quoting Herbert A. Bernhard, *The Minority Doctrine Concerning Direct Restraints on Alienation*, 57 Mich.L.Rev. 1173, 1180 (1959).

**{¶ 66}** The rule is not without exceptions. In *Ohio Soc. for Crippled Children & Adults, Inc. v. McElroy*, 175 Ohio St. 49, 52, 191 N.E.2d 543 (1963), we acknowledged the general rule that "where land is devised upon condition that the devisee shall not sell it, such a restraint is void as repugnant to the devise and contrary to public policy." But we also recognized that in certain situations a grantor might restrict the alienation of property placed in a charitable trust. We premised our decision on the public interest "in encouraging the creation and the

continuation of trusts for charitable or public purposes," as well as "the power of a court of equity to authorize a prohibited sale where necessary * * *, thereby preventing the trust property from being completely inalienable." *Id.* at 52-53.

{¶ 67} The Public Works Commission argues that we should make a similar exception here. But this case does not involve a charitable trust and none of the special rules allowing a court to authorize a sale in contravention of the deed's terms apply. Thus, under the long-followed rules of this state, the Transfer Restriction is void.

## B. Under the modern reasonableness approach, the Transfer Restriction is invalid

{¶ 68} Outside of the charitable trust context, this court has never before given effect to an absolute restraint on alienation of a fee simple. The traditional rule followed in Ohio and most jurisdictions was that restraints on alienation of fee-simple interests were presumptively void, whereas restraints on life estates and leaseholds were presumptively valid. Singer, 46 U.C.Davis L.Rev. at 1410; Meier & Ryan, *Aggregate Alienability*, 60 Vill.L.Rev. 1013, 1015 (2015). Other states, however, have moved away from blanket prohibitions on alienation restrictions and adopted a general reasonableness test. *See, e.g.*, *Gale v. York Ctr. Community Coop., Inc.*, 21 Ill.2d 86, 92-93, 171 N.E.2d 30 (1960).

{¶ 69} This reasonableness approach reflects an attempt to reconcile the traditional interests in favor of alienability of property with notions of freedom of contract. The approach is adopted by all three Restatements of Property. Most recently, the Third Restatement of Property has set forth a balancing test that weighs "the utility of the restraint against the injurious consequences of enforcing the restraint." 1 Restatement of the Law 3d, Property, Servitudes, Section 3.4 (2000). If the injurious consequences outweigh the restraint's utility, then the restraint is unreasonable and invalid. *See id.* Under this test, the restraint is examined "in the light of all the circumstances to determine whether the objective

sought to be accomplished by the restraint is worth attaining at the cost of interfering with the freedom of alienation." 1 Restatement 3d, Section 3.4, Reporter's Note.

**{¶ 70}** Applying this reasonableness test gets us to the same place as Ohio's traditional common-law rule. The Transfer Restriction is invalid as unreasonable because it constitutes a direct and absolute restraint on alienation with little corresponding benefit.

### 1. *The injurious consequences of the restraint*

**{¶ 71}** Under the reasonableness approach, the injurious consequences of a restraint are measured based on the form and degree of the restraint and the type of estate subjected to the restraint. *See* 10 Powell, *Real Property*, Section 77.01 (2021); *see also* 1 Restatement 3d, Section 3.4, Comment c. The harmful effects that occur as an incident of inalienability "include impediments to the operation of a free market in land, limiting the prospects for improvement, development, and redevelopment of land, and limiting the mobility of landowners and would-be purchasers." 1 Restatement 3d, Section 3.4, Comment c.

### a. *The form of the restraint*

**{¶ 72}** Transfer restraints generally come in one of three forms: disabling restraints, forfeiture restraints, and promissory restraints. 10 Powell, *Real Property*, Section 77.01; 4 Restatement of the Law, Property, Section 404 (1944). These three types of restraints can be distinguished based on the results of their violation. Meier & Ryan, *Aggregate Alienability*, 60 Vill.L.Rev. at 1035. A disabling restraint attempts to prohibit or invalidate transfers by declaring any transfer to be void. *Id.* A forfeiture restraint causes property to be forfeited to the original grantor or a third party if the grantee tries to subsequently transfer the property in violation of the restraint. *Id.* With a promissory restraint, a grantee promises not to transfer his interest and is liable in contract through damages or an injunction. 10 Powell, *Real Property*, Section 77.01.

**{¶ 73}** At first blush, the Transfer Restriction looks to be a promissory restraint. *See id.*; *see also* Meier & Ryan, *Aggregate Alienability*, 60 Vill.L.Rev. at 1035. The Development Corporation promises that it will not transfer the property and subjects itself to liquidated damages for violation of the deed restrictions. According to the lead opinion, though, the Public Works Commission's remedies are not limited to damages but may also include equitable relief, presumably including voiding the transfer. *See* lead opinion at ¶ 13. Under that view, the Transfer Restriction operates like a disabling restraint preventing any transfer of the property without the Public Works Commission's consent. *See* 1 Restatement of the Law 2d, Property, Donative Transfers, Section 4.3, Comment a (1983). The only difference is that in the case of a disabling restraint an attempted transfer is automatically invalid, while in the case of a promissory restraint someone else decides whether the transfer is to be repudiated. *Id.*

**{¶ 74}** Disabling restraints are almost always invalid because of their harsh effect of making a piece of property unmarketable. Meier & Ryan, *The Validity of Restraints on Alienation in an Oil and Gas Lease*, 64 Buffalo L.Rev. 305, 342 (2016); *see also* 4 Restatement 1st, Section 405 ("Disabling restraints, other than those imposed on equitable interests under a trust, are invalid"). Promissory restraints are generally subject to the same standards as forfeiture restraints and are only upheld if found to be reasonable. *See* 1 Restatement 2d, Sections 4.2 and 4.3.

**{¶ 75}** In considering the form of the restraint, the law also draws a distinction between direct and indirect restraints on alienation. A direct restraint is one that imposes express limitations on the ability to convey property by deed, will, contract, or other legal document. 1 Restatement 3d, Section 3.4, Comment b. An indirect restraint is one that does not directly inhibit the transfer of property but that may affect its value or limit the number of potential transferees. *Id.* An example of an indirect restraint is a provision in a deed requiring a transferee to pay a penalty if he transfers the property to someone else. *See id.*

{¶ 76} Here the restraint is a direct restraint. The deed flatly prohibits any transfer without the Public Work's Commission's consent. Because direct restraints "clearly interfere with the process of conveying land and have long been subjected to common-law controls," they must satisfy a more stringent test than indirect restraints. *Id.* While the justification for an indirect restraint need only be rational, a direct restraint must satisfy the reasonableness test. *Compare id.*, Section 3.4 *with id.*, Section 3.5.

### b. *The degree of the restraint*

{¶ 77} The law distinguishes between absolute and partial restrictions on alienation. An absolute restraint on alienation prohibits all transfers, without qualification. In contrast, a partial restraint will be qualified in some way. A partial restraint might prohibit alienation for only a certain time period, or to only a certain group of people, or by limiting the manner of transfer. 10 Powell, *Real Property*, Section 77.01. Whether a restraint is absolute or partial matters, because any increase in the degree of the restraint coincides with a decrease in a property's mobility and marketability.

{¶ 78} The Transfer Restriction is absolute because it prohibits all transfers to anyone for all time. The lead opinion posits that this Transfer Restriction is not absolute because transfers can occur with the Public Works Commission's permission. Lead opinion at ¶ 26. But it is always the case that an original transferor who has imposed a restraint may relinquish the restraint or decline to enforce it.

{¶ 79} Indeed, the Third Restatement flatly says that a consent-to-transfer requirement, like the one in this case, is "an unreasonable restraint on alienation unless there is strong justification for the prohibition, and, unless the consent can be withheld only for reasons directly related to the justification for the restraint." 1 Restatement 3d, Section 3.4, Comment d. The Comment notes that if the language of a restriction allows consent to be withheld arbitrarily, as is the case with the

Transfer Restriction, then the restraint can be reasonable "only if the person withholding consent is obligated to supply a substitute purchaser for the property." *Id.*

### c. *The type of estate involved*

{¶ 80} The third consideration is the type of estate involved. To use the bundle of sticks analogy, generally the greater the portion of the bundle covered by the restraint, the greater the restraint's toll on a property and thus the greater the restraint's justifying utility must be. *See* 1 Restatement 3d, Section 3.4, Comment c ("Permissible restraints on alienation of leaseholds are often greater than on fee-simple estates, and greater restraints on alienation of easements, profits, and covenant benefits are often permitted than on leaseholds").

{¶ 81} Here, the Transfer Restriction applies to the entirety of a fee-simple estate. Thus, in this regard, the injurious effects of the restriction are at their most severe.

### 2. *The utility of the restraint*

{¶ 82} The Transfer Restriction is an absolute and direct restraint on alienation of a fee-simple estate. Although it bears many of the attributes of a promissory restraint, under the lead opinion's construction it functions like a disabling restraint by giving the Public Works Commission unfettered discretion to void any transfer of the property. In this regard, the Transfer Restriction is on the most severe (or injurious) end of the spectrum of possible restraints on alienation.

{¶ 83} Under the reasonableness approach, the injurious consequences of the restraint are to be balanced against the utility of the restraint. 1 Restatement 3d, Section 3.4. There are a few considerations here that weigh on the side of enforcing the restraint. For one thing, this case involves an arms-length transaction rather than a donative transfer. *See* 61 American Jurisprudence 2d, Perpetuities and Restraints on Alienation, Section 91 (2021). Thus, many of the traditional concerns about dead-hand control of property do not apply. In addition, more severe

restraints on alienation are generally considered justified when land is held for conservation purposes. 1 Restatement 3d, Section 3.4, Comment c.

{¶ 84} The Public Works Commission primarily rests its case on two considerations relating to the utility of the Transfer Restriction. First, the Transfer Restriction is said to protect the public interest in maintaining the property as a green space. Second, the Transfer Restriction protects the public investment made through the Clean Ohio Conservation Fund by ensuring that the property remains in the possession of the original grant recipient.

{¶ 85} The problem, though, is that these interests are already protected by the Use Restriction. The Use Restriction prohibits the development of the land in any way that conflicts with use of the land as a "green space" nature conservation, thus fulfilling that purpose. And the public interest behind the Clean Ohio Conservation Fund grant is best understood as relating to the manner in which the property is used, not in ensuring that the property is held by any particular recipient.

{¶ 86} Indeed, the Use Restriction seems a far superior means to protect these interests than the Transfer Restriction. The Transfer Restriction is perpetual. The financial circumstances of nonprofit entities, like anyone else, are subject to change over time. One can imagine circumstances under which the Community Development Corporation might not be able to maintain the property as green space and the public interest is better served by allowing the property to be transferred to an entity better able to maintain it. The Transfer Restriction, however, would preclude such a transfer absent the Public Works Commission's consent. The Use Restriction, on the other hand, protects the property's use as green space regardless of who owns the property.

{¶ 87} Thus, if we apply the reasonableness test—assessing the utility of the restraint against the injurious consequences of enforcing the restraint—the restraint plainly fails. By the traditional measures, the injurious consequences are severe: the Transfer Restriction directly and absolutely restricts the alienation of a

fee-simple estate. And the Transfer Restriction offers very little in the way of utility: most, if not all, of the purported benefit served by the Transfer Restriction is already accomplished by the Use Restriction.

{¶ 88} Whether we apply our traditional rule prohibiting absolute restraints on alienation of a fee-simple estate or adopt the modern reasonableness test, the result is the same: the Transfer Restriction is invalid. I would reverse the court of appeals' decision to the contrary.

### III. How does the lead opinion get things so wrong?

{¶ 89} The reader might want to stop right here. What has been said in the previous section is all that is needed to decide this case. But, if one finds the lead opinion's analysis tempting (or is curious how it gets things so wrong), then read on.

{¶ 90} The lead opinion gets to where it gets through a process that goes like this. Step one, review and reverse the determination by the trial and appellate courts that there has been no violation of the Use Restriction, even though that issue has not been appealed and is not in front of us. Step two, decree that use restrictions and transfer restrictions are functionally equivalent and subject to the same legal standards. Step three, cherry pick a handful of cases involving things other than absolute restraints on alienation; then apply the standards from these cases to find the Transfer Restriction is valid.

{¶ 91} Every step of this analysis is wrong.

### A. Contrary to what the lead opinion says, we don't ordinarily review issues not in front of us

{¶ 92} The lead opinion begins by acknowledging that "no party to this appeal seeks reversal" of the "factual finding by the trial court that no violation of the use restriction had occurred as a result of the subsurface activity." Lead opinion at ¶ 15. But then it says that "because this court reviews legal issues de novo, we

are not constrained to accept the appellate court's legal analysis" as to whether there was a violation of the Use Restriction. *Id.* at ¶ 15.

{¶ 93} Huh? Of course, we review legal issues de novo. But we only review issues de novo that *have been raised by the parties*. The standard of review for legal issues has nothing to do with the long-established rule that we don't review issues that are not in front of us. *See, e.g.*, *State v. Quarterman*, 140 Ohio St.3d 464, 2014-Ohio-4034, 19 N.E.3d 900, ¶ 20; *Household Fin. Corp. v. Porterfield*, 24 Ohio St.2d 39, 46, 263 N.E.2d 243 (1970); *Stolz v. J & B Steel Erectors*, 155 Ohio St.3d 567, 2018-Ohio-5088, 122 N.E.3d 1228, ¶ 11; *United States v. Sineneng-Smith*, ___ U.S. ___, 140 S.Ct. 1575, 1579, 206 L.Ed.2d 866 (2020).

{¶ 94} We are often reminded that courts " 'do not, or should not, sally forth each day looking for wrongs to right' "; instead, they " 'normally decide only questions presented by the parties.' " *Sineneng-Smith* at ___, 140 S.Ct. at 1579, quoting *United States v. Samuels*, 808 F. 2d 1298, 1301 (8th Cir.1987) (Arnold, J., concurring in denial of reh'g en banc). This is because "justice is far better served when it has the benefit of briefing, arguing, and lower court consideration before making a final determination." *Sizemore v. Smith*, 6 Ohio St.3d 330, 333, 453 N.E.2d 632 (1983), fn. 2.

{¶ 95} There is no basis to reconsider the decisions by the trial court and the court of appeals that there was no violation of the Use Restriction. No party has challenged that finding. And no adversarial briefing has been presented on that point. By choosing to reach the issue anyway, the lead opinion strays well beyond its proper role.

### B. Use restrictions and transfer restrictions are not the same

{¶ 96} Things get even wackier. The lead opinion announces that it will not conduct "separate analyses for use and transfer restrictions." Lead opinion at ¶ 22. It justifies this decision with a formulation that reads more like a parody of legal reasoning than actual legal analysis: "while the caselaw contains threads

specific to the nuances of differing types of restrictions, we find that the property-law principles over time are sufficiently woven to create a sturdy fabric that at this time needs no additional support, repair, or bolstering from new theories or tests molded from the facts of this particular situation." *Id*. at ¶ 22.

**{¶ 97}** Threads of nuance and sturdy fabrics aside, legal authorities are united in the view that use restrictions and transfer restrictions are different. *See, e.g.*, 1 *Ohio Real Property Law and Practice*, Section 10.30 (2021) ("Ohio law distinguishes between restrictions on alienation of property and restrictions on use"); 1 Restatement 2d, Section 3.4 ("A restraint on the use that may be made of transferred property by the transferee is not a restraint on alienation, as that term is used in this Restatement"); 1 Restatement 2d, Reporter's Note to Section 3.4 ("The distinction set forth in this section between use restraints and restraints on alienation is generally recognized"); 4 Restatement, Property, Part II Introductory Note ("a use restriction is not violated by the making of a later conveyance and hence is not a 'restraint on alienation,' within the definition of that term as given [in Section 404 of the Restatement].");  Helene S. Shapo, George Gleason Bogert & George Taylor Bogert, *The Law of Trusts and Trustees*, Section 220 (2021) ("A use restraint * * * is not considered a restraint against alienation").

**{¶ 98}** And certainly, the lead opinion won't find much—if any—company among other courts that have considered the matter. *See, e.g.*, *"Automatic" Sprinkler Corp. of America v. Kerr*, 11th Dist. Lake No. 11-017, 1986 WL 7307, at *2 (June 30, 1986) ("a restriction on use * * * is not a restraint on alienation. * * * Ohio law generally adheres to the Restatement distinction between restraints on alienation and mere restrictions on the use of land"); *Seagate Condominium Assn., Inc. v. Duffy*, 330 So.2d 484, 486 (Fla.App.1976), fn. 2 ("There is a distinction between restraints on alienation and restraints on use"); *Prieskorn v. Maloof*, 128 N.M. 226, 1999-NMCA-132, 991 P.2d 511, ¶ 12, quoting 1 Restatement 2d, Section 3.4 (" 'A restraint on the use that may be made of transferred property by

the transferee is not a restraint on alienation' "); *Carma Developers (California), Inc. v. Marathon Dev. California, Inc.*, 2 Cal.4th 342, 369, 6 Cal.Rptr.2d 467, 826 P.2d 710 (1992) (contrasting direct restraints from indirect restraints, "an example of [which] is a use restriction"); *Spanish Oaks, Inc. v. Hy-Vee, Inc.*, 265 Neb. 133, 138-141, 655 N.W.2d 390 (2003) (discussing the distinction between indirect restraints—like use restrictions—and direct restraints); *Canova Land & Invest. Co. v. Lynn*, 299 Va. 604, 612, 856 S.E.2d 581 (2021) (relying in part on the fact that the restraint before the court was "a restraint on use, rather than a restraint on alienation, and is therefore more likely to be reasonable"); *Lamar Advertising v. Larry & Vickie Nicholls, L.L.C.*, 2009 WY 96, 213 P.3d 641, ¶ 17 (noting that "the economic principles that make direct restraints on alienation suspect do not apply in the context of indirect restraints imposed by servitudes"); *Mountain Brow Lodge No. 82, Indep. Order of Odd Fellows v. Toscano*, 257 Cal.App.2d 22, 25, 64 Cal.Rptr. 816 (1967) (noting a "sharp distinction * * * between a restriction on land use and a restriction on alienation").

**{¶ 99}** There are, of course, good reasons that everyone else makes a distinction between use and transfer restrictions. Unlike a use restriction, which confines only the scope of the land's marketable uses, a transfer restriction can take the land entirely out of the market. For this reason, transfer restrictions are more disfavored in the law and subject to much more exacting scrutiny than use restrictions. *Compare* 1 Restatement 3d, Section 3.4 (transfer restrictions that directly restrain the alienation of property are invalid unless they satisfy a reasonableness test) *with* Section 3.5 (use restrictions that only indirectly restrain alienation will be upheld as long as they are reasonable).

### C. The lead opinion relies upon cases that are plainly inapplicable

**{¶ 100}** The lead opinion's first two mistakes—reaching the Use Restriction though it is not in front of us and conflating use and transfer restrictions—lead to its next. Instead of assessing the Transfer Restriction under

the standards applicable to restraints of that type, it looks to caselaw assessing use restrictions.

{¶ 101} For example, the lead opinion claims that our jurisprudence has "threaded the needle toward keeping the agreement of the parties stitched together when deed restrictions are unambiguous and reasonable and has required that both the terms of a restrictive covenant and the intent of the parties in rendering the covenant as clearly expressed in its restrictive language be upheld." Lead opinion at ¶ 24. Apparently this is an overwrought way of saying that we give effect to negotiated deed restrictions. But in support, the lead opinion cites three cases, all of which deal with use restrictions, not transfer restrictions. *Id.* at ¶ 24, citing *Cleveland Baptist Assn. v. Scovil*, 107 Ohio St. 67, 72, 140 N.E. 647 (1923) (restrictive covenant limiting use of the property to a private residence); *DeRosa v. Parker*, 197 Ohio App.3d 332, 2011-Ohio-6024, 967 N.E.2d 767, ¶ 9-10, 12 (7th Dist.) (restrictive covenant prohibiting house trailers from being stored on property); *Head v. Evans*, 1st Dist. Hamilton No. C-790831, 1981 WL 9628, *3 (Feb. 11, 1981) (restrictive covenant providing that only one home could be constructed on tract). Thus, when it comes to absolute restraints on alienation, there is no support for the lead opinion's contention that Ohio courts will enforce such restraints simply because the parties have agreed to them.

{¶ 102} The lead opinion also claims that "the conventional rules against restraints" do not apply because this case involves a transfer "for a charitable or public purpose." Lead opinion at ¶ 29. To support this statement, the lead opinion cites a solitary case, *Ohio Soc. for Crippled Children & Adults*, 175 Ohio St. 49, 191 N.E.2d 543. But that case dealt not with a naked "charitable purpose" but with a charitable trust. And as explained earlier, the court in that case relied on the safety valve for alienability in charitable trusts by which an equity court may "authorize a prohibited sale where necessary for the proper accomplishment of the charitable or

public purposes of the trust, thereby preventing the trust property from being completely inalienable," *id.* at 53.

{¶ 103} The lead opinion also says that the restraint is not absolute because the Public Works Commission may authorize a transfer. It provides no caselaw supporting this proposition. And for good reason; as I explained above at Section II.B.1.b, it is widely understood that a consent-to-transfer provision that does not provide that the consent cannot be arbitrarily withheld does not save such a restraint from being classified as an absolute restraint on alienation. *See* 1 Restatement 3d, Section 3.4, Comment d.

{¶ 104} The bottom line is that the authority relied upon by the lead opinion in no way supports the result that it reaches. That should come as no surprise. By reaching issues not before us, and by conflating use and transfer restrictions, the lead opinion has gone far afield of the proper inquiry in this case.

## IV. We should reverse the decision of the court of appeals and reinstate the judgment of the trial court

{¶ 105} Whether we apply our precedent or the modern reasonableness approach to restraints on alienation, the result is the same. The Transfer Restriction is invalid. It is a direct and absolute restraint on alienability of a fee simple absolute, something that has long been disfavored in this state and across the country. And it serves little if any offsetting benefit; the purported interests to be attained by the Transfer Restriction are achieved through the Use Restriction.

{¶ 106} Because the Transfer Restriction is invalid as an unreasonable restraint on alienation, there is no need to consider whether injunctive relief would be appropriate for a violation of the Transfer Restriction. I would reverse the decision of the court of appeals to the extent that it declares the Transfer Restriction enforceable and reinstate the decision of the trial court. Because the lead opinion goes in a completely different direction, I dissent.

KENNEDY and FISCHER, JJ., concur in the foregoing opinion.

––––––––––––––––

Critchfield, Critchfield & Johnston, Ltd., and Andrew P. Lycans; and Manmeet S. Walia, for appellant Siltstone Resources, L.L.C.

Frost Brown Todd, L.L.C., Kevin L. Colosimo, Christopher W. Rogers, and Daniel P. Craig, for appellant American Energy-Utica Minerals, L.L.C.

Krugliak, Wilkins, Griffiths & Dougherty Co., L.P.A., Scott M. Zurakowski, Matthew W. Onest, and William G. Williams, for appellant Eagle Creek Farm Properties, Inc.

Dave Yost, Attorney General, Benjamin M. Flowers, Solicitor General, Samuel C. Peterson, Deputy Solicitor General, and James Patterson and Christie Limbert, Assistant Attorneys General, for appellee.

Bricker & Eckler, L.L.P., Daniel C. Gibson, and Kara H. Herrnstein; and Zachary M. Simpson, urging reversal for amicus curiae Gulfport Energy Corporation.

Hanlon, Estadt, McCormick & Schramm Co., L.P.A., Erik A. Schramm Sr., and Kyle W. Bickford, urging reversal for amicus curiae Axebridge Energy, L.L.C.

Pelini, Campbell & Williams, L.L.C., Craig G. Pelini, and Paul B. Ricard, urging reversal for amicus curiae Whispering Pines, L.L.C.

Isaac, Wiles, Burkholder & Teetor, L.L.C., Maribeth Meluch, and Dale D. Cook, urging reversal for amicus curiae Guernsey County Community Development Corporation.

––––––––––––––––